**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SUAREZ CORPORATION INDUSTRIES;
EMERSON SONNY CLOPPER; PATRICIA
CLOPPER; ELIZABETH PISHNER,
Plaintiffs-Appellees,

v.

DARRELL V. MCGRAW, JR., Attorney
General of the State of West
Virginia, in his official capacity;

No. 98-2696

THOMAS RODD, individually,
Defendants-Appellants,

and

JOHN DOE, I-III, individually,
Defendants,

THOMAS TINDER,
Party in Interest.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CA-95-248-2)

Argued: October 26, 1999

Decided: February 2, 2000

Before LUTTIG and MOTZ, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Vacated and remanded by published opinion. Senior Judge Hamilton
wrote the opinion, in which Judge Luttig and Judge Motz joined.

**COUNSEL**

**ARGUED:** Rebecca Ann Baitty, REBECCA A. BAITTY, P.A., Sarasota, Florida, for Appellants. C. Allen Foster, PATTON BOGGS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Rudolph L. DiTrapano, DITRAPANO, BARRETT & DIPIERO, Charleston, West Virginia, for Appellant McGraw; Robert F. Cohen, Jr., COHEN, ABATE & COHEN, L.C., Fairmont, West Virginia, for Appellant Rodd. Eric C. Rowe, PATTON BOGGS, L.L.P., Washington, D.C.; Herbert L. Hively, II, Hurricane, West Virginia, for Appellees.

_____

**OPINION**

HAMILTON, Senior Circuit Judge:

Darrell V. McGraw (McGraw), the Attorney General of West Virginia, and Thomas Rodd (Rodd), a former West Virginia Deputy Attorney General, appeal from that portion of a district court order that denied their motion for summary judgment on the 42 U.S.C. § 1983 claim asserted by Suarez Corporation Industries (SCI) alleging that McGraw and Rodd retaliated against SCI for exercising its First Amendment right to free speech. McGraw and Rodd contend that the district court erred in denying them summary judgment on this claim because they are entitled to qualified immunity. We agree. Accordingly, we vacate that portion of the district court's order appealed from and remand for further proceedings consistent with this opinion.

I.

SCI, an Ohio corporation, markets a variety of consumer goods, under various trade names, through direct mail marketing that invites potential customers to participate in sweepstakes or other promotions. Prior to September 1994, SCI, under the trade name Lindenwold Fine Jewelers (Lindenwold), conducted business in West Virginia by soliciting mail orders for its products. Three of these solicitations are relevant to this case: (1) a "free" 1-carat Lindenwold cubic zirconium diamond simulant, already set in a mounting, for which the consumer must pay $19 for the mounting and an enhanced opportunity to win

2

$10,000 (the CZ solicitation); (2) a cash prize of "as much as" $1000 contained in a clutch purse ensemble, for which the consumer must pay $12, plus $2 shipping and handling (the clutch purse solicitation); and (3) leaded crystal candlesticks, for which the consumer must pay $19 in order to receive the candlesticks, a free glass heart-shaped dish, and an enhanced opportunity to win a $1000 cash prize (the candlesticks solicitation).

The CZ solicitation notified consumers that they had won a 1-carat Lindenwold cubic zirconium diamond simulant, and further that they were eligible to win an additional $10,000 prize. The "free" cubic zirconium diamond simulant, however, was already mounted in a ring or necklace that consumers could purchase for $19. The solicitation informed consumers that their opportunity for winning the $10,000 was enhanced if the mounting was purchased. If consumers only wanted the "free" simulant, they had to affix a label from one form to another form, handwrite a "code number" on the new form, then fill out a release form, and return it to SCI in a #10 white envelope. Failure to properly follow these procedures resulted in the forfeiture of the simulant and eligibility to win the $10,000. If consumers were willing to pay the $19 for the mounting, to claim their simulant and be eligible for the enhanced prize, they only needed to complete a simple form and return it to SCI in a self-addressed envelope. Anytime consumers attempted to claim just the simulant, SCI would send a follow-up solicitation informing them that unless they purchased the mounting, their file would be closed. The language of the follow-up solicitation intimated that if a consumer's file was closed, the consumer would no longer be eligible for the $10,000 prize.

The clutch purse solicitation notified consumers that they had won a cash prize of "as much as $1000." The cash prize was contained in a five piece clutch purse ensemble that consumers could purchase for $12, plus $2 for special packaging, shipping, and insurance. For 99.5% of the time, the cash prize was $1. Although consumers were informed that they need not purchase the ensemble to claim their prize, SCI claimed that because it would have to remove the prize from the purses, those who ordered the ensemble would receive priority handling. Moreover, to claim the cash prize without ordering the ensemble, consumers were required to: (1) cut out the prize confirmation bar code from the order form; (2) paste it onto a 3-1/2" x 5-1/2"

3

index card furnished by the consumers; (3) write their name, address, and phone number on the index card; and (4) return it in a #10 white envelope. If the consumers failed to follow these procedures, they forfeited the cash prize. In contrast, consumers willing to purchase the ensemble simply had to complete an order form and return it in a self-addressed envelope.

Finally, the candlesticks solicitation offered consumers a pair of leaded crystal candlesticks for $19, plus a bonus glass heart-shaped dish at no additional cost. All consumers receiving the solicitation were eligible to win a $1000 cash prize, but purchasers of the candlesticks received priority handling and "immediate security processing." The text of the solicitation led consumers to believe that their chances of winning the $1000 were enhanced if they purchased the candlesticks. Consumers who did not want to purchase the candlesticks, but who wanted to remain eligible for the $1000, were required to print their name, address, and customer number onto a 3-1/2" x 5-1/2" index card and return it, along with the envelope provided by SCI for those who did choose to purchase the candlesticks, in a second envelope.

Based on solicitations analogous to SCI's, in January 1994, the West Virginia Attorney General's office (the AG's office) initiated an action in the Circuit Court of Kanawha County, West Virginia, against four direct marketing companies alleging violations of the state's Consumer Credit and Protection Act, W. Va. Code §§ 46A-1-101 to -8-102 (1998), and the Prizes and Gifts Act, id. §§ 46A-6D-1 to -10.[1] In August 1994, the AG's office moved to join 102 additional defendants, including SCI. At the same time, the AG's office applied for a preliminary injunction against all of the defendants. The state circuit judge granted the motion to join the additional defendants but instructed the AG's office to select a representative number of defen-

_____

[1] The state's amended complaint charged that the defendants were illegally soliciting and obtaining money from West Virginians by using misleading and deceptive solicitations. The state's lawsuit requested consumer restitution, civil penalties, and preliminary and permanent injunctive relief.

dants against whom it wished to proceed. Thereafter, the AG's office notified the state circuit court that it would proceed only against SCI.[2]

Following the initiation of the state court litigation, SCI and the AG's office had a number of less than congenial confrontations. SCI claims that, in August 1994 it met with Rodd, who was then the West Virginia Deputy Attorney General assigned to the Consumer Protection Division, about a possible settlement, but that Rodd responded by "launch[ing] into a tirade that was not factually substantive," and "calling Lindenwold a bunch of crooks." (J.A. 113). Rodd allegedly stated that it would "become his mission to `cause as much pain, damage and injury as possible to SCI,'" unless SCI voluntarily withdrew its direct marketing business from the State of West Virginia. Id. Rodd testified in a deposition that he gave SCI the choice of "[a]gree[ing] to a temporary injunction or [the AG's office would] go forward and seek to inflict the maximum degree of penalty."[3] (J.A. 84 n.7). SCI's response to this meeting was to file a complaint with the Better Government Bureau (BGB), which in turn filed a Freedom of Information Act request with the AG's office.[4]

In late August 1994, a number of newspaper articles were published in which members of the AG's office accused SCI/Lindenwold of cheating West Virginia residents out of their money. There is also

_____

[2] "[T]he mailings of [SCI] were selected by the Attorney General as representative of the solicitations in question of all of the defendants." West Virginia v. Imperial Mktg., 506 S.E.2d 799, 802 (W. Va. 1998) (Imperial Mktg. II).

[3] In Rodd's deposition, the sentence preceding the one quoted above, which was not included in the joint appendix, clarifies that he was referring to "the maximum amount of penalty possible that will cause considerable pain and damage to your client . . . because these civil penalties can be very high." (SCI's Response to Plaintiff's Motion for Summary Judgment Exhibit G at 37 (emphasis added)).

[4] The BGB is an Ohio based corporation that purports to fight government abuse of power and corruption. The BGB turned out to be an entity over which SCI had substantial influence, despite BGB's alleged unbiased third-party status. The involvement of BGB spawned a lawsuit against McGraw similar to this one. That suit was resolved by a jury in McGraw's favor on September 1, 1998.

an indication that, at approximately the same time these articles were published, the AG's office had received information from the Washington State Attorney General's Office that SCI's <u>modus operandi</u> for fighting state investigations was to engage in an extensive media campaign criticizing public officials. Based on this information, the West Virginia Managing Deputy Attorney General, Fran Hughes, informed both McGraw and Rodd about her concerns with respect to the beginnings of an SCI media campaign.

On September 2, 1994, SCI published a two-page ad in <u>The Charleston Gazette</u> newspaper. The ad was in the form of a letter from Lindenwold employees to McGraw and Rodd, which read, in part, "DO NOT PLAY POLITICS WITH OUR LIVELIHOOD OR THE RIGHTS OF OUR 20,000 SATISFIED CUSTOMERS IN THE STATE OF WEST VIRGINIA." (SCI's Response to Motion for Summary Judgment Exhibit A-1). The employees proceeded to criticize McGraw for his prosecution of the lawsuit against SCI and demanded "to know why [McGraw and Rodd] are wasting taxpayer's dollars when we have managed our business so responsibly, yet <u>real</u> crimes such as drug trafficking, rape and assaults are left unprosecuted by you as West Virginia's top law enforcement officers."[5] <u>Id.</u> (emphasis in original).

On September 9, 1994, the state circuit court ruled that there were reasonable grounds to believe that SCI's solicitation activities were illegal, misleading, deceptive, fraudulent, and unconscionable. The state circuit court then issued a preliminary injunction enjoining a number of SCI's marketing schemes.[6]

_____

[5] Interestingly, in West Virginia, the AG's office has no authority to initiate a criminal prosecution. <u>See Manchin v. Browning</u>, 296 S.E.2d 909, 915 (W. Va. 1982) (noting that the authority to initiate criminal prosecutions "is exercised in West Virginia by the respective county prosecuting attorneys").

[6] SCI appealed to the West Virginia Supreme Court of Appeals, which, on March 20, 1996, affirmed the preliminary injunction against SCI finding that "the Attorney General has offered sufficient evidence to establish reasonable cause to believe that SCI is engaging in or is likely to engage in conduct proscribed by the Prizes and Gifts Act." <u>West Virginia v. Imperial Mktg.</u>, 472 S.E.2d 792, 810 (W. Va. 1996) (<u>Imperial Mktg.</u>

Following the September 9, 1994 hearing, a number of press accounts appeared in the media quoting Rodd as saying "I think people are tired of the elderly being victimized like this" and "Attorney General McGraw is not going to be intimidated or bullied." (J.A. 118 (quoting Court Bans Ohio Firm, Cites "Scam", Parkersburg Centinel, September 8, 1994)). Also during September 1994, McGraw sent a communication to other state attorneys general claiming that SCI had "been sued by the United States Postal Service for mail fraud." Id. According to SCI, the United States Postal Service proceedings did not allege the crime of mail fraud.**7**

In a letter sent by McGraw to the state attorneys general on October 6, 1994, McGraw stated that "it has been reported to me that in the course of [a state circuit court's] hearing (newspaper report attached hereto) that [SCI's lawyer] threatened violence upon Deputy Attorney General Rodd." (J.A. 119). McGraw went on to warn that "there is a possibility that [SCI's] modus operandi might include a proclivity to violence." Id.

Also, in the fall of 1994, Michael Paris, the new president of the Better Business Bureau/Canton Regional, Inc. (the BBB), was seek-

_____

I). The court concluded that "SCI's sweepstakes are nothing more than ingeniously crafted deceptive methods to sell its merchandise by deluding consumers with expectations of greater rewards if they purchase the product that is the subject of the solicitation." Id. at 802. The court observed that "SCI, has made fear and confusion the catalysts to assure a completed sale of whatever product is being peddled." Id. at 805. Accordingly, the court affirmed the award of the preliminary injunction. See id. at 810.

On April 25, 1997, a West Virginia state circuit court granted summary judgment to the AG's office and permanently enjoined SCI from conducting illegal activities within the State of West Virginia. The grant of summary judgment and the issuance of a permanent injunction were affirmed by the West Virginia Supreme Court of Appeals on June 25, 1998. See Imperial Mktg. II, 506 S.E.2d at 809-10.

**7** The United States Postal Service action was dismissed pursuant to a settlement agreement in March 1995 after SCI sued the service claiming retaliation for SCI's political speech critical of federal regulators.

ing to expand the role of the BBB in West Virginia. **8** He contacted Rodd to facilitate the expansion but Rodd responded, in essence, that the West Virginia AG's office would "have a hard time sort of respecting the integrity of your Better Business Bureau" if the BBB was going to tolerate the conduct of SCI, one of its members. (J.A. 89). SCI alleges that Rodd went further, "advising [BBB's] representatives that the AG would offer no assistance to BBB in its expansion plans in West Virginia for so long as SCI remained a member of BBB." (J.A. 49).

On October 11, 1994, Paris convened a special executive committee meeting of the BBB. In the meeting, the executive committee members discussed SCI's history with the BBB, current litigation against SCI, as well as Rodd's alleged comment that "`if [SCI] is a member of the Bureau, they have lost all credibility in the Better Business Bureau.'" (J.A. 76). Paris conceded that this was typical of other comments received from across the country. Four months later, on February 16, 1995, the BBB expelled SCI but later reinstated it as a result of a lawsuit filed by SCI against the BBB.

In 1995, Dun & Bradstreet issued a report on SCI. The report, in part, was based on information provided by the AG's office on January 10, 1995. According to Dun & Bradstreet, the information stated that the United States Postal Service had issued a temporary restraining order against SCI and that mail returns "will be seized pending the outcome of 6 counts of mail fraud filed against the company by certain states in conjunction with the US Postal Service." (SCI's Resp. Mot. Summ. J. Ex. B-2, at 6). The report went on to state that SCI "subsequently declared mailings void" in several states.**9** Id. Finally, the report also mentioned that: (1) the BBB had reported that numer-

_____

**8** Canton Regional, Inc. is based in Canton, Ohio and operates the Better Business Bureau for twelve counties in Ohio and nine counties in West Virginia.

**9** Although SCI attributes that portion of the report to McGraw and Rodd, the report indicates that the information was derived directly from SCI. A sentence on page one of the report states:"Management [SCI] reported that mailings to these states have been suppressed due to unique features in the laws of these states." (SCI's Resp. Mot. Summ. J. Ex. B-2, at 1).

8

ous complaints had been filed against SCI, but that most had been resolved; and (2) the "U.S. Postal Service indicated it has filed two civil false representation suits against [SCI]." Id.

In addition to the above incidents, McGraw and Rodd are alleged to have repeatedly defamed SCI in the press and to other state attorneys general. These alleged defamatory statements included assertions that SCI: (1) "preys on the elderly, infirmed and incapacitated," Josef Federman, Suarez Corp. Files Lawsuit vs. West Virginia Attorney General, Canton Repository, April 6, 1995 (attached as Ex. C-38 to SCI's Resp. Mot. Summ. J.); (2) "is a gambling syndicate from Ohio that also sells jewelry," (SCI's Resp. Mot. Summ. J. Ex. B-3 (fax from the Charleston Daily Mail quoting McGraw)); (3) "representatives . . . have `a documented proclivity to violence,'" id.; and (4) has "link[s] to organized crime," (SCI's Resp. Mot. Summ. J. Ex. A-9 (published in 1996 and 1998 by the AG's office in "Consumer News")).[10]

On April 4, 1995, SCI, Emerson Clopper, Patricia Clopper, and Elizabeth Pishner brought this action against McGraw and Rodd in the United States District Court for the Southern District of West Virginia.[11] On August 28, 1995, the plaintiffs filed an amended complaint containing nine counts. Counts one, two, three, and six were brought pursuant to 42 U.S.C. § 1983. In count one, SCI sought

_____

[10] Throughout the time period in which SCI claims McGraw and Rodd engaged in the alleged misconduct, SCI was not a silent bystander. SCI continued to publish numerous ads, conducted a radio ad campaign, and sent out a mass mailing critical of McGraw and Rodd. Not only did the ads attack McGraw and Rodd for their conduct with regard to the suit against SCI, but the ads also focused on McGraw and Rodd's personal lives. (SCI's Resp. Mot. Summ. J. Ex. O-2.) When McGraw ran for reelection, Benjamin Suarez (Suarez), the president of SCI, spent more than $300,000 to defeat McGraw. When McGraw's brother ran for a seat on the West Virginia Supreme Court of Appeals, Suarez created a political action committee with a budget of $100,000 to assist McGraw's brother's opponent.

[11] Emerson Clopper, Patricia Clopper, and Elizabeth Pishner are West Virginia residents who purchased goods from SCI or participated in its promotions.

9

declaratory and injunctive relief on the basis that McGraw and Rodd allegedly retaliated against SCI for exercising its First Amendment rights. In count two, SCI sought declaratory and injunctive relief on the basis that McGraw and Rodd's actions violated its rights secured by the Equal Protection Clause of the Fourteenth Amendment. In count three, SCI sought money damages from McGraw and Rodd, in their individual capacities, on the basis that they allegedly retaliated against SCI for exercising its First Amendment right to free speech. In count six, the Cloppers and Pishner sought injunctive relief from the state circuit court's preliminary injunction (which was still in effect) at least to the extent it impeded their First Amendment right to receive communications from SCI.

The remaining claims of the amended complaint were brought pursuant to West Virginia state law. In count four, SCI sought money damages based on McGraw and Rodd's alleged defamatory statements. In count five, SCI sought money damages based on McGraw and Rodd's alleged intentional interference with SCI's contractual relations. In count seven, the Cloppers and Pishner sought injunctive relief based on an alleged deprivation of their state constitutional right to receive communications. In count eight, SCI sought money damages based on McGraw and Rodd's alleged interference with SCI's prospective contractual relations. In count nine, SCI sought money damages on the basis that McGraw and Rodd's actions constituted a prima facie tort.

On September 21, 1995, McGraw and Rodd moved to dismiss the amended complaint based, in part, on the ground of absolute immunity. On November 16, 1995, the district court denied McGraw and Rodd's motion to dismiss. From this decision, McGraw and Rodd filed an interlocutory appeal in this court.

On appeal, in addition to raising a claim of absolute immunity, for the first time, McGraw and Rodd argued that the plaintiffs' claims were barred by the Eleventh Amendment and/or principles of qualified immunity. On September 11, 1997, this court affirmed in part, reversed in part, vacated in part, and remanded in part. See Suarez Corp. Indus. v. McGraw, 125 F.3d 222, 230-31 (4th Cir. 1997). With respect to count seven, we reversed the district court's decision, concluding that count seven was barred on its face by the Eleventh

10

Amendment.**12** See id. at 230. With respect to the remaining counts, we affirmed the district court's holding that these counts were not barred by absolute immunity. See id. at 230. To the extent counts one, two, six, and seven sought relief from the state circuit court's preliminary injunction, we vacated the district court's decision on these counts because, while this appeal was pending, the state circuit court entered a permanent injunction. See id. at 227-28. To the extent counts one, two, six, and seven sought relief from the permanent injunction, this court vacated the district court's decision on these counts and remanded with instructions to dismiss these counts to the extent these counts were barred by the Rooker-Feldman doctrine. See Suarez Corp. Indus., 125 F.3d at 228. Finally, because McGraw and Rodd asserted qualified immunity as a defense for the first time on appeal, this court refused to consider that defense. See id. at 226.

On remand, McGraw and Rodd moved for summary judgment and briefed the Rooker-Feldman issue, while also presenting the defense of qualified immunity to the district court. The district court ruled on the motion for summary judgment and issued an order on November 11, 1998. With respect to counts one, two, and six, the district court held that these counts were barred by the Rooker-Feldman doctrine. With respect to counts five and eight, the district court held that these counts failed to state a claim and were also barred by the Rooker-Feldman doctrine. With respect to count nine, the district court dismissed this count for failure to state a claim. With respect to counts three and four, the district court held that genuine issues of material fact precluded the grant of summary judgment.

In addressing McGraw and Rodd's defense of qualified immunity as to count three, the district court held that the facts as alleged by SCI were sufficient to demonstrate that McGraw and Rodd retaliated against SCI for exercising its First Amendment right to free speech. The district court also concluded that the right to be free from retaliation for exercising one's First Amendment right to free speech was

_____

**12** This court addressed McGraw and Rodd's Eleventh Amendment immunity argument even though it was raised for the first time on appeal because, unlike a claim of qualified immunity, Eleventh Amendment immunity is jurisdictional in nature. See Suarez Corp. Indus., 125 F.3d at 227.

11

clearly established at the time of McGraw and Rodd's alleged misconduct.

After the district court denied their defense of qualified immunity, McGraw and Rodd filed a notice of appeal on that issue. The district court then granted McGraw and Rodd's motion to stay its proceedings pending the appeal on the issue of qualified immunity.

II.

"The district court's denial of a claim of qualified immunity, to the extent it turns on an issue of law, is an appealable `final decision' within the meaning of 28 U.S.C. § 1291 under the collateral order doctrine." Gould v. Davis, 165 F.3d 265, 268 (4th Cir. 1998); see also Behrens v. Pelletier, 516 U.S. 299, 307-09 (1996) (allowing a second interlocutory appeal on the issue of qualified immunity, the first after a motion to dismiss was denied and the second after a motion for summary judgment was denied). The grant or denial of summary judgment based on qualified immunity is reviewed de novo. See Norwood v. Bain, 166 F.3d 243, 252 (4th Cir. 1999) (en banc). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether a party is entitled to summary judgment, the record is viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A.

"To avoid `excessive disruption of government,' a qualified immunity is recognized to protect government officials performing discretionary functions from civil damage suits `insofar as [the officials'] conduct does not violate clearly established rights of which a reasonable person would have known.'" Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The United States Supreme Court recently set forth a two-prong test for evaluating a claim of qualified immunity. See Wilson v. Layne, 119 S. Ct. 1692, 1696-97 (1999). A court "`must first deter-

12

mine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'" Id. at 1697 (quoting Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999)). If so, the court then proceeds to "`determine whether that right was clearly established at the time of the alleged violation.'" Id. (quoting Conn, 119 S. Ct. at 1295). The Wilson Court reasoned that this test would "`spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Id. (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Id.

The first prong under Wilson requires that we determine whether SCI "alleged the deprivation of an actual constitutional right." Id. (internal quotation marks omitted). SCI alleges McGraw and Rodd deprived it of its First Amendment right to free speech when they engaged in various acts of retaliation in response to SCI's initial exercise of its right to free speech. To analyze whether SCI alleged the actual deprivation of a constitutional right, the obvious place to begin is with the constitutional right at issue--the First Amendment right to freedom of speech.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. See ACLU v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); see also Pickering v. Board of Educ., 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech"). Thus, by engaging in retaliatory acts, public officials place informal restraints on speech "allow[ing] the government to `produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." Perry v. Sindermann, 408 U.S. 593, 597 (1972) (alterations in original) (citation omitted).

13

However, not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation. See DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995) ("Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."). Rather, a § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights. See Wicomico County, 999 F.2d at 785 ("In order to state a retaliation claim, Appellees are required to show that WCDC's actions adversely impacted these First Amendment rights.").

In light of these principles, a § 1983 retaliation plaintiff must establish three elements in order to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. See Huang v. Board of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990). Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. See Wicomico County, 999 F.2d at 785 (stating that "a showing of adversity is essential to any retaliation claim"). Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action. See Huang, 902 F.2d at 1140.

In this case, the parties do not dispute the fact that SCI's advertisements criticizing McGraw and Rodd were speech protected by the First Amendment. The parties' dispute centers on whether McGraw and Rodd's conduct adversely affected SCI's constitutionally protected speech and, if so, whether that conduct was causally connected to SCI's speech.

B.

Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts. See Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) ("[T]he definition of adverse action is not static across contexts."). For example, in the public employment context, the

14

speaker is the employee and the retaliator is the public employer. The employment relationship between the speaker and retaliator creates competing interests between "the interests of the[public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. To properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than de minimis or trivial. See Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999); Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998); DiMeglio, 45 F.3d at 806. Thus, a public employer adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights, see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-87 (1977); or when it makes decisions, which relate to "promotion, transfer, recall, and hiring," based on the exercise of an employee's First Amendment rights, Rutan v. Republican Party, 497 U.S. 62, 79 (1990). On the other hand, courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands. See Benningfield v. City of Houston, 157 F.3d 369, 376-77 (5th Cir. 1998) (holding that employees "falsely accused" of criminal wrongdoing and "verbally reprimanded" by their employer failed to allege adverse employment actions sufficient to constitute retaliation), cert. denied, 119 S. Ct. 1457 (1999); Harrington v. Harris, 118 F.3d 359, 366 (5th Cir. 1997) (holding that an employer's criticism of employees and failure to award them merit pay increases did not constitute actionable adverse employment actions).

Just as the nature of the retaliatory acts impacts whether a public employee's First Amendment rights were adversely affected, so too the nature of the retaliatory acts impacts whether those acts are actionable when a private citizen is the speaker and a public official is the retaliator. For example, a public official who restricts the award of or terminates public benefits based on the citizen's exercise of his First Amendment rights adversely affects that citizen's First Amendment rights. See, e.g., Board of County Comm'rs v. Umbehr, 518 U.S. 668, 686 (1996) (holding that the termination of a garbage contract

15

constituted retaliation for an independent contractor's exercise of freedom of speech); Sherbert v. Verner, 374 U.S. 398, 409-10 (1963) (holding that retaliation existed where the government denied unemployment benefits to a person whose religion precluded her from accepting a job that required her to work on Saturdays). The same officials, however, are obviously permitted to require the government contractor to submit documentation that no public funds were spent on espousing political views, or to require a person seeking unemployment benefits to fill out an additional form explaining why she cannot work on Saturdays.

The nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech. Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.[13] See X-Men Sec., Inc. v. Pataki, Docket Nos. 97-9023(L), 97-9595(CON), 1999 WL 993442, at *14 (2d Cir. Nov. 2, 1999) (to be reported at 196 F.3d 56) (holding that, in the absence of threats, intimidation, or coercion, legislators' "disparaging, accusatory, or untrue statements about X-Men fail to state a claim for violation of X-Men's constitutional rights"); Colson v. Grohman, 174 F.3d 498, 512 (5th Cir. 1999) (holding that a citizen's First Amendment rights were not adversely affected because she had "alleged only that she was the victim of criticism, an investigation (or an attempt to start one), and false accusations: all harms

_____

[13] The requirement that public official's speech include a threat, coercion, or intimidation, to adversely affect a citizen's First Amendment rights recognizes that a balance must be struck between the citizen's right to exercise his First Amendment rights and the public official's personal First Amendment rights, as well as his duty to the public to speak out about matters of public concern. See Penthouse Int'l Ltd. v. Meese, 939 F.2d 1011, 1015 (D.C. Cir. 1991) ("As part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate.").

that, while they may chill speech, are not actionable under our First Amendment retaliation jurisprudence"); Penthouse Int'l Ltd. v. Meese, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991) (holding that public officials were entitled to qualified immunity for criticism they leveled at publishers of pornography and noting that "the Supreme Court has never found a government abridgment of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction"); R.C. Maxwell Co. v. Borough of New Hope, 735 F.2d 85, 89 (3d Cir. 1984) (holding that a borough that sent letters to a landowner encouraging, but not threatening, intimidating, or coercing, the landlord to terminate its leases with a billboard owner did not violate the billboard owner's First Amendment rights where the landowner terminated the leases in order to curry favor with the borough); Hammerhead Enters., Inc. v. Brezenoff, 707 F.2d 33, 38-39 (2d Cir. 1983) (holding that a public official who sent letters to retail stores requesting that they refrain from selling a controversial board game did not violate the board game manufacturer's First Amendment rights, and declaring that to rise to the level of conduct that violates free speech rights, a public official's comments must "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request"); Toma v. Hinkel, 947 P.2d 816, 821 (Alaska 1997) (concluding that the First Amendment protects an official's right to speak truthfully in response to criticism even if the official's speech is retaliatory and stating, "We do not believe that imposing section 1983 liability on a public official who responds in kind to protected speech critical of the official would be consistent with the First Amendment."); cf. Bantam Books, Inc. v. Sullivan , 372 U.S. 58, 68 (1963) (finding a constitutional violation where a Rhode Island Commission's conduct amounted to "thinly veiled threats to institute criminal proceedings" against publishers who did not make efforts to stop circulating publications on a list created by the Commission); Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1045 (9th Cir. 1994) (holding that defamation must be accompanied by a harm to "some more tangible interests" to be actionable retaliation (internal quotations omitted)). One possible exception to this rule is where the retaliatory disclosure of information "relates to`those personal rights that can be deemed `fundamental' or `implicit in the concept of ordered liberty.'"; that is, the resulting injury caused by the disclosure of the information in retaliation for engaging in protected conduct is suffi-

17

ciently embarrassing, humiliating, or emotionally distressful. See Bloch v. Ribar, 156 F.3d 673, 681 (6th Cir. 1998) (holding that a sheriff's publication of the explicit details of a rape in retaliation for the rape victim's criticism of the sheriff was sufficiently adverse to "chill people of ordinary firmness"). This aspect of the contextual analysis, however, has been limited to cases in which the public official has disclosed damaging information about an individual. See Mattox v. City of Forest Park, 183 F.3d 515, 521 n.3 (6th Cir. 1999) ("Analysis of retaliation cases under the First Amendment is distinct, and the effect of public disclosure of damaging information about an individual may be enough to trigger constitutional protection, as in Bloch and Barrett.").**14**

In this case, SCI, the private citizen, alleges that McGraw and Rodd, public officials who were in the process of suing SCI for violations of West Virginia law, retaliated against SCI by: (1) making alleged defamatory statements to the media and to other attorneys general; (2) making truthful statements to the BBB; and (3) making defamatory statements to Dun & Bradstreet.**15** McGraw and Rodd's alleged retaliatory acts are in the nature of speech. Therefore, the interests in conflict are SCI's First Amendment right to speech versus McGraw and Rodd's First Amendment speech rights, as well as their duty to keep the public and other law enforcement officials informed about consumer fraud and their ongoing investigation and prosecution

_____

**14** Of course, in limited circumstances, non-retaliatory speech may be actionable. For example, in Paul v. Davis, 424 U.S. 693 (1976), the United States Supreme Court acknowledged that defamatory statements, when accompanied by a harm to a more tangible interest, were actionable under the Fifth and Fourteenth Amendment Due Process Clauses. See id. at 701-02. In a different context, we have recognized that an individual's constitutional right to privacy may be implicated when a public official discloses "information that touch[es] on rights that are fundamental or implicit in the concept of ordered liberty." Ferguson v. City of Charleston, 186 F.3d 469, 482 (4th Cir. 1999) (internal quotation marks omitted).

**15** Although SCI alludes to other defamatory comments McGraw and Rodd made to television stations and legislators as a "public relations campaign to link SCI with organized crime activities," (Appellee's Br. at 6), we group this conduct with SCI's allegations that McGraw and Rodd defamed SCI to the media and other attorneys general.

18

of SCI. Because none of McGraw and Rodd's statements concerned private information about an individual, we find that the appropriate inquiry to determine whether McGraw and Rodd adversely affected SCI's First Amendment speech rights to be whether their speech was threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow. See X-Men Sec., 1999 WL 993442, at *14; Penthouse Int'l, 939 F.2d at 1016; Hammerhead Enters., 707 F.2d at 39.

III.

A.

SCI claims that the following alleged defamatory statements to the media constituted actionable retaliation: (1) Rodd's statement saying, "I think people are tired of the elderly being victimized like this" and "Attorney General McGraw is not going to be intimidated or bullied" (J.A. 118); (2) McGraw and Rodd's assertions that SCI "preys on the elderly, infirmed and incapacitated," Federman, Suarez Corp. Files Lawsuit vs. West Virginia Attorney General, supra; (3) McGraw's assertion that SCI "is a gambling syndicate from Ohio that also sells jewelry," (SCI's Resp. Mot. Summ. J. Ex. B-3); (4) McGraw's statement that "representatives [of SCI] have`a documented proclivity to violence,'" id.; and (5) the AG's office's assertion that SCI has "link[s] to organized crime" (SCI's Resp. Mot. Summ. J. Ex. A-9). In addition, SCI claims that McGraw retaliated against it when he made statements to other attorneys general claiming that SCI had "been sued by the United States Postal Service for mail fraud," and stating that "it has been reported to me that in the course of the hearing . . . that [SCI's lawyer] threatened violence upon Deputy Attorney General Rodd," and that "there is a possibility that [SCI's] modus operandi might include a proclivity to violence." (J.A. 119).

With respect to these alleged defamatory statements, SCI has failed to show that McGraw and Rodd's statements can reasonably be interpreted as intimating that McGraw and Rodd would punish, sanction, or take an adverse action against SCI. None of the statements even imply that McGraw and Rodd would utilize their governmental power to silence SCI. Thus, SCI has failed to show that McGraw and Rodd's alleged defamatory statements to the media and other attorneys gen-

19

eral adversely affected its First Amendment rights. McGraw and Rodd's communications to the other attorneys general <u>did</u> provide warnings about the type of conduct SCI allegedly engaged in when sued, but <u>did not</u> encourage any action that caused adversity to SCI.

B.

SCI contends that Rodd's statements to the BBB's president, Mr. Paris, constituted actionable retaliation because the BBB later expelled SCI. The only evidence in the record that describes Rodd's conversation with Paris is Rodd's deposition. In his deposition, Rodd states:

> I inquired if he knew anything about a Canton, Ohio company called Lindenwold Fine Jewelers. And I think he said yes, he did. And I said, are they a member of the Better Business Bureau or is there a relationship there. And he said yes, they are. And I said, you know, we welcome the opportunity to work with Better Business Bureaus all the time, but we are going to have a hard time sort of respecting the integrity of your Better Business Bureau . . . . If this is what the Better Business Bureau, the kind of conduct it allows by its members, then we just don't have a lot of respect for that. So that . . . is going to reflect upon what we think about you and if we have any future contacts or relationships.

(J.A. 119). After this discussion with Rodd, Paris convened a special executive committee meeting of the BBB.

The minutes of the meeting indicate that Paris began the meeting by giving some historical background of SCI, including that: (1) "[t]here were problems during the first years they were with the Bureau"; (2) in June 1980, SCI was dropped from the membership roster for not following the membership standards but was reinstated in 1982; (3) legal actions were brought "against the company in 1991, 1992, 1993, and 1994"; (4) there was a civil suit pending in West Virginia at the time of the meeting; and (5) United States postal authorities had recently found mail fraud in one of SCI's promotions.**16** (J.A.

_____

**16** The BBB minutes indicate that the Ohio Attorney General's office was investigating SCI but that Ohio's consumer laws were different from

20

76). The meeting's notes indicate that Paris stated that Rodd commented that "`if [SCI] is a member of the Bureau, they have lost all credibility in the Better Business Bureau.' They will not do anything at all to help us in membership if this is the kind of members we accept. This was typical of other comments received from across the country." Id.

Rodd's statements to the BBB, which SCI apparently concedes are true and which arguably led to the BBB's subsequent expulsion of SCI from its membership, do not evidence that McGraw and Rodd adversely affected SCI's First Amendment rights. Nothing in Rodd's testimony can reasonably be interpreted as intimating that McGraw and Rodd would punish or take an adverse action against SCI or the BBB.[17]

Indeed, the BBB itself did not feel threatened by Rodd's comments; rather, it interpreted his comments as a refusal to "do anything at all to help us in membership if this is the kind of members we accept." (J.A. 76). Absent a direct or implied threat or coercive language, Rodd's statements are speech that did not adversely affect SCI's First Amendment rights, but which allowed the BBB to determine its own course of action.

C.

The final act of actionable retaliation SCI claims is that McGraw and Rodd retaliated against it by making defamatory statements to Dun & Bradstreet. Specifically, SCI claims that Rodd stated to Dun

_____

other states and that if the BBB expected Ohio "to do something about [SCI] in the near future . . . [it] may have a long wait. The last definitive thing heard from an Attorney General representative is they want to go in with other states and file a class action suit against [SCI]." (J.A. 76). In addition, the minutes reflect that the BBB concluded that it spent more money on handling complaints against SCI than SCI paid in dues.

[17] Because none of Rodd's language was threatening, coercive, or intimidating, we need not address whether a threat, coercion, or intimidation need be directed at the speaker or whether it can be directed at a third party.

21

& Bradstreet that: (1) the United States Postal Service had issued a temporary restraining order against SCI and that mail returns "will be seized pending the outcome of 6 counts of mail fraud"; and (2) that SCI "subsequently declared mailings void" in several states. (SCI's Resp. Mot. Summ. J. Ex. B-2, at 6). SCI argues that these statements were defamatory and constituted retaliation. Moreover, because Dun & Bradstreet included these alleged defamatory remarks in its "Business Information Report," SCI asserts that its credit history was adversely affected. Even if we assume those statements were defamatory, SCI's arguments are without merit.

The major flaw in SCI's claim is that SCI has not submitted any evidence that the statements to Dun & Bradstreet can reasonably be interpreted as intimating that McGraw and Rodd would punish, sanction, or take adverse action against SCI. The only evidence in the record reflects that Dun & Bradstreet solicited information from the AG's office and Rodd responded. Dun & Bradstreet then reported in its Business Information Report the information Rodd provided. None of the alleged defamatory language, however, implies a threat to SCI.[18]

_____

[18] We note that McGraw and Rodd engaged in some of the alleged conduct prior to SCI ever exercising its First Amendment rights. Thus, SCI's claim that "but for" the exercise of its First Amendment rights McGraw and Rodd would not have retaliated is undermined by the evidence in the record. Moreover, based on the findings of the West Virginia Supreme Court of Appeals, see Imperial Mktg. I, 472 S.E.2d at 805, we are hard pressed to find that McGraw and Rodd's conduct was motivated by anything other than a desire to rid West Virginia of SCI's illegal (as found by the West Virginia Supreme Court of Appeals) direct marketing ploys. However, because McGraw and Rodd's conduct did not adversely affect SCI's First Amendment rights, we need not address the causal connection element of SCI's First Amendment retaliation claims.

22

IV.

For the reasons stated herein, we vacate that portion of the district court's order appealed from and remand for further proceedings consistent with this opinion.**19**

<u>VACATED AND REMANDED</u>
_____

**19** To the extent that SCI asserts to incorporate a due process claim into its First Amendment retaliation claim by alleging that it was defamed and deprived of a "more tangible interest" as required by <u>Paul v. Davis</u>, 424 U.S. at 701, we have reviewed this claim and find it to be without merit.

23