In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 07-2240

RANDALL L. WOODRUFF, as Bankruptcy Trustee
for LEGACY HEALTHCARE, INC.,

*Plaintiff-Appellant,*

*v.*

JO ANN MASON, GERALD COLEMAN, SUZANNE HORNSTEIN,
CLARA MCGEE, KAREN POWERS, ROBERT STARK, MARGARET
ELLIS, AVONA CONNELL and KAREN DAVIS,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 C 306—**Larry J. McKinney**, *Judge.*

———————

ARGUED FEBRUARY 13, 2008—DECIDED SEPTEMBER 5, 2008

———————

Before CUDAHY, POSNER and EVANS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Legacy Healthcare, Inc. (Legacy)
and its predecessor, Community Care Centers, Inc. (Com-
munity), operated a number of long-term care facilities
in Indiana. On February 18, 2000, Legacy brought this
action under 42 U.S.C. § 1983, alleging that employees of

the Indiana Family and Social Services Administration (FSSA) and the Indiana State Department of Health (ISDH) violated its rights under the First Amendment and Fourteenth Amendment.[1] The FSSA administers Indiana's Medicaid program through its Office of Medicaid Policy and Planning (OMPP); the ISDH is the state agency authorized to inspect care facilities and determine their compliance with federal Medicaid regulations. Legacy believes that FSSA employees developed an antipathy toward Legacy and Community after years of contentious litigation between the parties. It claims that the FSSA convinced the ISDH to use its regulatory authority to launch a predatory enforcement campaign aimed at driving Legacy out of business. According to Legacy, this predatory enforcement constituted First Amendment retaliation and violated the Equal Protection Clause. The district court granted summary judgment in favor of Defendants on all counts. We now affirm.

**I.**

The record in this case is voluminous. Any reader interested in a complete exposition of the facts is referred to the district court's lengthy background discussion. *See Woodruff v. Wilson*, 484 F.Supp.2d 876, 880-925 (S.D. Ind. 2007). We recite only the facts that are necessary to our decision, and we read these facts, wherever possible, in the light most favorable to Legacy.

---

[1] On August 12, 2003, Randall L. Woodruff, the trustee in Legacy's bankruptcy proceeding, was substituted as the real party in interest.

Legacy and Community have been locked in litigation with the FSSA for years. In 1988, Community brought a challenge to state Medicaid reimbursement rules in Indiana state court. Community convinced the Delaware County Superior Court to issue an injunction requiring the Indiana Department of Public Welfare (IDPW)[2] to pay Community a higher reimbursement rate during the pendency of the litigation. The case was then moved to Blackford County Superior Court, which ruled in favor of Community on the merits. The IDPW appealed, and the case was consolidated with a large class action suit that challenged the same reimbursement rules. *See Indiana State Bd. of Pub. Welfare v. Tioga Pines Living Center, Inc.*, 622 N.E.2d 935 (Ind. 1993). The cases were transferred directly to the Indiana Supreme Court, which reversed the lower courts and upheld the regulations. *Id*. Karen Davis, an attorney for the FSSA who had been involved in the litigation since 1990, went back to Blackford County court to recoup the millions of dollars paid to Community under the erroneous injunction. The FSSA argued that Community had been unjustly enriched by the injunction and had been misusing Medicaid funds. Community argued that it had not been unjustly enriched because it spent all of the money on patient care. In the end, the FSSA's recoupment attempts were unsuccessful.

Community also sued the IDPW in federal court over Medicaid reimbursement for its Hamilton Heights facility (later known as New Horizon). Hamilton Heights was a

---

[2] The IDPW was the predecessor to the FSSA, which was created in 1991.

skilled nursing facility (SNF) that was in the process of being converted into an intermediate care facility for the mentally retarded (ICF/MR). An ICF/MR is required to provide a higher level of care than an SNF and is therefore reimbursed at a higher rate. Community sued the IDPW, arguing that it should be paid the higher ICF/MR reimbursement rate while it underwent its conversion. Community again obtained a preliminary injunction and the IDPW again paid a substantial amount of additional reimbursement ($1,783,480.20). The district court also ruled for Community on the merits, but we reversed. *See Lett v. Magnant*, 965 F.2d 251 (7th Cir. 1992). The FSSA attempted to recoup some of excess reimbursement paid to Hamilton Heights by withholding payment for current services. Community was able to avoid the recoupment attempts, in part by arguing that the recoupment would cause imminent business failure. *Family and Social Servs. Admin. v. Cmty. Care Centers, Inc.*, 641 N.E.2d 1012 (Ind. Ct. App. 1994). The FSSA's subsequent attempts to recoup the money also failed. *See Cmty. Care Centers, Inc. v. Sullivan*, 701 N.E.2d 1234 (Ind. Ct. App. 1998).

Legacy also litigated with state agencies over whether the FSSA was required to recognize Legacy as the owner of Community facilities after Douglas Bradburn, Legacy's President, acquired all of his parents' business assets in October 1993. The FSSA eventually entered into a joint stipulation with Legacy, settling the issue. Davis allegedly became "visibly angry" when she learned of this result, presumably because the transfer of the business operations to Legacy prevented the ISDH from recouping funds by automatically deducting them from payments for current services.

In 1996, ISDH initiated proceedings against Legacy's North Vernon facility for decertification. During administrative proceedings seeking the decertification of North Vernon, Legacy discovered that on November 6, 1996, Beverly Craig of the ISDH had called a meeting, which included officials from the FSSA and the Attorney General's office, regarding the state of health care at Legacy facilities. The attendees included Davis, Jo Anne Mason, Suzanne Hornstein, Gerald Coleman and others.[3] Craig later testified that she called the meeting because she was concerned that Legacy was failing to provide adequate care at a number of different facilities.

Legacy claims that it had a perfect record of compliance with state regulations over the first thirty-two years of its operation, easily passing inspections and enjoying a good reputation with the public. Following the November 6, 1996 meeting, however, there was a "deluge" of allegedly predatory enforcement actions: 12 jeopardy charges, 14 licensure actions and 14 decertifications over the next three years.[4] Legacy believes that the subsequent enforce-

---

[3] Suzanne Hornstein was the Division Director of Long Term Care at the ISDH. Coleman was the Director of Risk Management for the Regulatory Services of the ISDH, but assisted as counsel on the 1996 licensure action against North Vernon. Mason was employed as a Deputy Attorney General from July 1995 to December 1997, when she became the Director of Legal Affairs at the Indiana State Department of Health, where she remained until December 2000.

[4] From January 1, 1995 to March 8, 2004, ISDH cited 405 instances of substandard quality of care, 9 of which were at
(continued...)

ment campaign, which allegedly included the manipula-
tion of survey findings, was designed to drive Legacy out
of business. Legacy points to three specific examples:
(1) the withholding of North Vernon's copy of its license;
(2) the manipulation of 180-day cycles; and (3) the de-
certification of New Horizon on the basis of a single
standard. We will explain these actions briefly.

The dispute over the decertification of North Vernon was
eventually completed in April 1997. ISDH conducted a
number of recertification surveys over the next few
months; Legacy was then recertified. But Legacy never
received the physical copy of its license. Despite numerous
calls to ISDH, Legacy was unable to obtain a copy of its
license. On March 17, 1998, Legacy received its annual
renewal application; the application was processed but,
again, no copy of the license was issued. Because Legacy
never received the license, the facility was never certified
for Medicare. At a meeting in 1998 between Legacy, the
ISDH and an official from the Health Care Financing
Administration (HCFA), Hornstein stated that the license
was not delivered because it was "in litigation." Years
later, she testified that she was not aware that North
Vernon had not been given its license, explaining that
she assumed that it had been.

---

[4] (...continued)
Legacy facilities. During the same period, ISDH found 36
instances of immediate jeopardy at ICR/MR facilities, two
of which were at New Horizon. From 1996 to March 2004, ISDH
filed 209 license revocation actions, sixteen of which were
against Legacy facilities. It also issued 449 citations, 17 to Legacy
facilities.

The ISDH is responsible for conducting surveys at long-term care facilities. When a survey reveals a deficiency, a 180-day cycle begins during which the facility must correct the deficiency or face decertification: if the deficiency is corrected, the cycle ends; if the deficiency is not corrected, additional surveys are undertaken and the 180-day cycle continues to run. Legacy claims that Hornstein broadened the scope of surveys at Legacy facilities to wrongfully keep it out of compliance. Specifically, Legacy asserts that the 180-day cycle was improperly applied at Legacy's Portland East facility in 1997, 1998 and 1999, at Columbus in 1998 and 1999, at New Castle in 1998, at Portland West in 1998 and at North Vernon in 1998.

Legacy also alleges that Hornstein and Coleman improperly decertified the New Horizon facility in 1998 for its failure to comply with a single "standard of participation." In early 1998, Hornstein and Coleman issued a notice of decertification to New Horizon; the decertification notice was based upon a recently conducted survey of the facility which had found three deficiencies involving "standards of participation." Two of these deficiencies were apparently corrected, but the decertification action proceeded nonetheless. Legacy believes that this was improper. Legacy claims that its "comprehensive study" of the fifteen ICF/MRs operating in Indiana revealed that eight other facilities had been certified even though they had standard-level deficiencies.

Legacy filed its complaint for injunctive relief and damages on February 18, 2000. The district court denied its motion for a preliminary injunction on March 6, 2000. Legacy filed its First Amended Complaint on April 17,

2000. The defendants filed their motion for summary judgment on August 16, 2004. On April 27, 2007, the district court granted the defendants' motion for summary judgment. This appeal follows.

## II.

We review a grant of summary judgment de novo. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 974 (7th Cir. 2004). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We construe facts in the light most favorable to the non-moving party but "we are not required to draw every conceivable inference from the record." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Instead, we draw only reasonable inferences. *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

On appeal, Legacy argues that it produced enough evidence to create a material issue of fact as to both its First Amendment retaliation claim and its equal protection claim.[5] At oral argument, counsel for Legacy conceded, wisely we think, that the "heart" of the First

---

[5] Legacy does raise a third claim—that the Defendants entered into a civil conspiracy to violate its constitutional rights. This claim is predicated on the same facts as the other two claims, and it rises and falls with them.

Amendment retaliation claim was the November 6, 1996 meeting. Legacy claims that it was at this "clandestine summit meeting" that Davis and Mason, who worked at the FSSA, persuaded Hornstein and Coleman of the ISDH to launch a predatory enforcement campaign against Legacy in retaliation for Legacy's exercise of its First Amendment right to petition the courts.[6] Even if the ISDH's predatory enforcement campaign was not motivated by a spirit of retaliation, Legacy claims that the ISDH's intentional manipulation of regulatory rules was so arbitrary and irrational that it violated the Equal Protection Clause.[7]

Ultimately, both of these arguments fail. Legacy's First Amendment claim fails because Legacy has not established that the FSSA was actually aggravated by the reimbursement litigation, or that the FSSA was the guiding hand behind the ISDH's enforcement actions. Legacy's equal protection claim fails because it has failed to indicate similarly situated facilities to which it can be compared and because it has failed to sufficiently state the factual basis of its claims. We will first discuss the First Amendment claim; we then discuss the equal protection claim,

---

[6] In their brief on appeal, the Plaintiffs dropped any First Amendment retaliation claims against anyone other than Davis, Hornstein, Coleman and Mason.

[7] The only defendants to the equal protection claim are Hornstein, Coleman and McGee. Thus, it appears that Legacy has abandoned all claims against Powers, Stark, Ellis and Connell.

which we divide in three parts to reflect Legacy's three main arguments on appeal.[8]

### III.

The First Amendment right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S. Ct. 609, 30 L. Ed.2d 642 (1972); *NAACP v. Button*, 371 U.S. 415, 429-30, 83 S. Ct. 328, 9 L. Ed.2d 405 (1963). Legacy's numerous challenges to the state regulatory scheme throughout the 1980s and 1990s would, therefore, appear to be protected activities. *See, e.g.*, *Powell v. Alexander*, 391 F.3d 1, 20 (1st Cir. 2004). Legacy believes that the FSSA developed a growing hostility toward it as a result of the reimbursement litigation. Not only was Legacy was "a thorn" in the FSSA's side, the FSSA was also unable to recoup the millions of dollars paid to Legacy under erroneous injunctions. According to Legacy, the FSSA turned to the ISDH and persuaded it to drive Legacy out of business.

---

[8] We note that Legacy includes a lot of information in its statement of facts that it fails to develop in the argument section of its brief. It is not enough "merely to refer generally to these actions in [the] statement of facts." *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 529 (7th Cir. 2003). Legacy must "raise [the issue] in the argument section of [its] brief, and support [its] argument with pertinent legal authority." *Id*.

To establish a prima facie case of First Amendment retaliation, Legacy must establish that (1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a "at least a motivating factor" in the Defendants' decision to take the retaliatory action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). The defendants concede that Legacy's challenges to the state regulatory scheme constituted protected activity under the First Amendment. Neither the parties nor the district court discuss the second element in detail. We need not dwell on it here. Instead we focus, as the parties do, on the third element.

The third element of a First Amendment retaliation claim is the element of causation. Legacy must show "a causal link between the protected act and the alleged retaliation." *Roger Whitmore's Automotive Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir. 2005); *accord Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004). Legacy does not need to show that its litigation history was the only factor that motivated the defendants but it must show that it was "a motivating factor." *Spiegla*, 371 F.3d at 942. The evidence used to establish this element may be either direct or circumstantial. *Id*.

It becomes immediately clear that Legacy's causation theory will not be straightforward. The retaliatory action allegedly suffered by Legacy was the predatory enforcement campaign undertaken by the ISDH. The protected litigation activity, however, involved Legacy and the

FSSA. To establish a retaliatory motive, therefore, Legacy must show that *the FSSA's* antagonism toward Legacy was a motivating factor in *the ISDH's* predatory enforcement campaign. Legacy has no evidence that ISDH officials were distressed in the slightest by Legacy's challenges to the reimbursement rates. Similarly, Legacy has almost no evidence that FSSA officials participated in the alleged predatory enforcement campaign. Thus, Legacy must show that the FSSA convinced the ISDH to retaliate against Legacy *on its behalf*. To do this, Legacy must first establish the FSSA officials wanted to retaliate against Legacy for the reimbursement litigation with Legacy. Legacy must then show that the FSSA communicated its hostility to the ISDH.

Legacy has a difficult time establishing that the FSSA developed any hostility toward it at all. Legacy's best argument that the agency had become hostile toward it is the fact that the FSSA failed to recoup millions of dollars paid to Legacy under the injunctions. While this fact provides important context for Legacy's story, it is not sufficient as a basis for the ascription of a retaliatory motive to the state agency. It is not enough simply to show that the state agency could have been frustrated by the inability to recoup the money; there must be some persuasive evidence that suggests that the agency was actually hostile.

It bears repeating here that "[n]ursing homes are a highly regulated industry, and some tension between operators of homes and regulators is to be expected, as are occasional adversarial proceedings." *Blue v. Koren*,

72 F.3d 1075, 1084-85 (2d Cir. 1995). If the natural tensions that result from adversarial proceedings and regulatory enforcement actions sufficed to establish evidence of retaliatory motive, then the regulatory scheme could very well be undermined. State enforcement agencies have every right to vigorously enforce the law. Legacy's evidence must suggest something beyond the typical "antagonism that arises between a regulator and a regulated (a relationship easily inflamed by difficult personalities)." *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006). It does not. The sole piece of concrete evidence offered by Legacy is Bradburn's observation that Davis became "visibly angry" when she learned that the ISDH had entered into a joint stipulation with Legacy. Davis' alleged outburst of anger, however, was an isolated incident; it does not reflect any sustained hostility on the part of the ISDH.

Even if Legacy has no direct evidence of hostility, Legacy believes that the circumstances surrounding the November 6, 1996 meeting of FSSA and ISDH officials were so unusual that one could reasonably infer that something malevolent was afoot. (We note here that Legacy has no evidence that the officials who attended the November 6, 1996 meeting actually discussed a predatory enforcement campaign against Legacy; their argument is entirely circumstantial.) First of all, Legacy argues that there was no reason that FSSA officials should have been at the meeting. More importantly, Legacy stressed that the meeting provided Davis and Mason an opportunity to convince the ISDH to launch a predatory enforcement campaign and to discuss the details of that campaign.

Legacy also notes that a "deluge" of violations and enforcement actions immediately followed.

Legacy's theory is severely undermined by the fact that it was an ISDH official, Beverly Craig, who called the meeting—not Davis. Craig testified that she called the meeting because North Vernon was already in decertification proceedings and because she had serious concerns about the health of patients in two Legacy facilities. The district judge below found that there was "uncontroverted evidence" that Legacy's North Vernon facility was having difficulties meeting government standards of care.

Legacy seems to believe that the very fact that other agencies were present at the meeting provides reason to be suspicious. It points out that the FSSA has no role in the ISHA's enforcement of quality of care regulations and the ISDH has no role in the FSSA's administration of the Medicaid reimbursement program. But there is nothing wrong with state agencies working together to solve problems, and it is clear that each of the agencies present at the meeting had a legitimate interest in the case. Specifically, Craig explained that FSSA officials were present because there was a possibility that the facility was being reimbursed for services it did not provide, which would obviously be of interest to the FSSA. The FSSA was also present because it would have to terminate payments in the event of any decertification. Craig explained that Mason, who worked at the time in the Attorney General's office, was present because there would likely be issues with enforcing any decertification actions. Legacy does not address any of these points.

Instead, Legacy argues that the Defendants' attempt to suppress evidence of the meeting reveals that there was something to hide. Legacy points to the Defendants' initial reluctance to answer questions about the meeting, the Defendants' inability to remember details of the meeting and a false answer to an interrogatory filed by Coleman that denied that the meeting took place. The Defendants' reluctance to discuss the meeting is easily explained by the fact that Legacy's inquiries into the meeting were made during its administrative appeal of the ISDH's decertification action at North Vernon. The parties were in an adversarial relationship at the time and, when Legacy pressed for deposition testimony, counsel for ISDH raised an objection based on attorney-client privilege. Craig and Hornstein did end up testifying about the meeting. Legacy also finds it incredible that the participants later professed that they did not remember the details of the meeting. Legacy is here referring to deposition testimony taken in 2006—ten years after the alleged meeting. Lapses of memory are to be expected when that much time passes.[9]

Legacy's best evidence is that, during the administrative proceedings regarding North Vernon's decertification, Coleman signed a false interrogatory that denied that the meeting had taken place. Just ten days after the meeting took place, Legacy asked whether the FSSA and ISDH had contacted each other regarding North Vernon.

---

[9] Legacy's resort to the "adverse inference" rule, *see, e.g.*, *P.R. Mallory & Co. v. NLRB*, 400 F.2d 956 (7th Cir. 1968), is unavailing.

Coleman answered, "Not to our knowledge." When Hornstein was asked at her deposition whether this was true, she conferred with Coleman, who admitted it to be an "error." This evidence is certainly not to be scoffed at. But given the adversarial posture of the inquiry, the subsequent correction and Legacy's failure to prove so many other aspects of its theory, we do not believe that this mistake alone can establish a retaliatory motive. Without a retaliatory motive, the First Amendment claim fails.

IV.

Even if Legacy cannot show that the ISDH's predatory enforcement campaign was in retaliation for Legacy's exercise of its First Amendment rights, Legacy argues that the campaign was so irrational and arbitrary that it violated the Equal Protection Clause. This is, of course, the well-known "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 120 S. Ct. 1073, 145 L. Ed.2d 1060 (2000) (per curiam). The Equal Protection Clause "secure[s] every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id*. "The paradigmatic 'class of one' case . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005). Because "endless vistas of federal liability," *id*.,

are opened when the misapplication of local law becomes a "federal case," *McDonald*, 371 F.3d at 1001, we have said that it is "difficult" to succeed on a "class of one" theory. *Id.*

To establish its "class of one" claim, Legacy must show that "(1) it has intentionally been treated differently from other similarly situated facilities; and (2) there is no rational basis for the difference in treatment *or* the cause of the differential treatment is a 'totally illegitimate animus'" towards it. *Maulding Dev., LLC v. City of Springfield, Illinois*, 453 F.3d 967, 970 (7th Cir. 2006) (emphasis added). In keeping with the "difficult" burden of proof in "class of one" cases, we have said that similarly situated facilities necessary to establish the first element must be "*prima facie* identical in all relevant aspects." *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002). Because the first element is dispositive in this case, we need not pursue the second.

Legacy's argues that the following three actions by the Defendants violated the Equal Protection Clause: (A) decertifying New Horizon because it violated a single "standard of participation"; (B) misapplying an informal cycle-breaking rule when inspecting Legacy facilities; and (C) refusing to give Legacy's North Vernon facility a copy of its license. As we shall explain, the first instance fails because Legacy has failed to establish that similarly situated facilities were treated differently. The second instance, which is essentially an argument that the ISDH's unevenly applied an unwritten rule, fails because Legacy has failed to define the rule with the

requisite level of clarity. The third instance is insufficient because Legacy does not adequately establish the factual basis for its claim. These three examples of violations of the Equal Protection Clause will be discussed in turn.

**A.**

Legacy first alleges that the ISDH wrongfully attempted to decertify New Horizon based on its failure to comply with a single "standard of participation." This action was improper, Legacy argues, because federal regulations "provide for" certification of facilities with standard-level deficiencies. Legacy also claims that this decertification was unprecedented in Indiana, which proves that Legacy facilities were being treated differently. We find, however, that Legacy has failed to show similarly situated comparators.

Some background is in order. Federal regulations require facilities participating in Medicare and Medicaid programs to comply with federal safety regulations. *See* 42 U.S.C. § 1396a(a)(9),(33). The ISDH has the responsibility to inspect facilities and to enforce those regulations in Indiana. *See* 42 C.F.R. § 442.109(a); IND. CODE § 16-28-12-1. Not all safety violations, however, are treated in the same way. For example, a violation of a "condition of participation" is a much more serious affair than a violation of a "standard of participation." In most situations, the ISDH cannot certify a facility that fails to comply with a "condition of participation." *See* 42 C.F.R. § 442.101(d). In contrast, the ISDH "may certify" a facility with

standard-level deficiencies, if certain conditions are met. *See* 42 C.F.R. § 442.105. The facility must first submit a "written plan for correcting the deficiencies," and the ISDH must approve that plan. *See* 42 C.F.R. § 442.105(b). The ISDH must then ensure that the deficiencies at the facility do not "jeopardize . . . health or safety" or "seriously limit the facility's capacity to give adequate care." *See* 42 C.F.R. § 442.105(a). If a facility has a history of deficiencies, the ISDH must determine whether the facility is making good-faith efforts to comply, or whether it is making the best use of its resources. *See* 42 C.F.R. §§ 442.105(c), 442.105(d). If all those hurdles are cleared, then the facility may be certified.

Legacy seems to believe that facilities with standard-level deficiencies are certified as of right. As we have explained, this is not the case: facilities with such deficiencies must satisfy additional criteria before being certified. In fact, Legacy has not even established that *it* satisfied all the necessary requirements. It does not mention whether it submitted an acceptable plan of correction, whether the ISDH made a determination about potential harm to residents at New Horizon or Legacy's ability to provide services or whether its history of noncompliance was a relevant factor. Similarly, Legacy has not presented any details regarding the eight facilities that were certified with standard-level deficiencies. These comparators must be identical to Legacy "in all relevant aspects." *See Purze*, 286 F.3d at 455. Without information regarding the facts that are material to the ISDH's decision to certify, we cannot determine that Legacy was treated

unfairly.[10] The fact that the action at North Vernon was unprecedented is insufficient. As Legacy itself notes, there are only fifteen ICF/MR facilities in Indiana. It may well be that the North Vernon facility was the first facility with standard-level deficiencies to fail to satisfy the additional requirements for certification. The decertification on a single standard, then, does not provide support for Legacy's equal protection claim.

**B.**

Legacy also claims that the ISDH manipulated its "cycle-breaking methodology" in order to target Legacy facilities for decertification. Legacy argues that the uneven application of the cycle-breaking rules reveals the ISDH's intent to treat Legacy facilities differently. Unfortunately, Legacy has provided us with precious little information about these cycle-breaking rules. What we know of the rules is gleaned from a fragment of Hornstein's testimony and from an email sent by an ISDH supervisor named Mary Wassel. In the end, we find that Legacy has failed

---

[10] Legacy also relies heavily on a decision from an administrative law judge (ALJ), who found that a standard-level deficiency was not grounds for terminating Legacy's certification. It is unclear whether the ALJ found that it was impermissible, in principle, to decertify on a single standard-level deficiency or whether the decertification action in question was not supported by the record. This is irrelevant, however, because this portion of the ALJ's decision was overturned by the Appeals Panel.

to explain with sufficient clarity exactly how these rules are properly applied. In short, Legacy cannot show that a rule has been unevenly applied when the rule itself is shrouded in mystery.

Before getting into cycle-breaking, we must know something about the 180-day decertification cycle. The ISDH is responsible for determining whether long-term care facilities "substantially comply" with federal Medicaid requirements. *See* 42 C.F.R. § 442.109(a). To make this determination, the ISDH must perform inspections (or "surveys") and may perform them "as frequently as necessary to . . . determine whether a facility complies with the participation requirements." *See* 42 C.F.R. § 488.308. When a survey reveals deficiencies that preclude a finding of substantial compliance, a facility has six months to rectify the deficiency or face mandatory decertification. *See* 42 C.F.R. § 488.412. When a deficiency is found, the ISDH schedules a post-review survey to determine whether the deficiency has been corrected. If the deficiency has been corrected, the 180-day cycle ends. If the deficiency has not been corrected, the 180-day cycle continues to run and additional surveys are conducted to monitor the facility's progress toward compliance. This is the "180-day decertification cycle."

Cycle-breaking deals with a narrower situation. It is, in effect, a derivative of the 180-day decertification cycle. The standard application of the 180-day cycle becomes complicated when a facility that is in the process of correcting a previous deficiency is cited with a new, unrelated

deficiency. The question then arises whether the facility has 180 days to rectify the new deficiency (that is, whether the new deficiency starts *its own* separate cycle) or whether the facility must rectify both the old and new deficiencies within the 180-day cycle started by the original deficiency. This distinction is very important to the facilities because if a separate cycle runs with each deficiency, they have more time to bring the facility in question into compliance.

Legacy argues that a separate cycle should begin when the new deficiency has not been previously cited. Legacy claims that Hornstein ordered surveyors at Legacy facilities to improperly broaden the scope of follow-up surveys. These surveys cited new deficiencies that were not cited in the original surveys. Thus, even if Legacy had corrected the previous deficiencies, the new deficiencies would keep them out of compliance.

Legacy has not pointed to any federal, state or agency regulation in which this cycle-breaking rule is codified, nor has Legacy provided us with any authoritative statement of the rule. Legacy also makes no attempt to derive the cycle-breaking rule from federal regulations. Our review of the federal regulations discloses no support for this rule. The regulations state only that, as long as the facility is not in "substantial compliance" for six months straight, it must be decertified. *See* 42 C.F.R. § 488.412. It would not appear to matter, then, whether it was an old deficiency or a new deficiency that was keeping the facility out of compliance.

Federal regulations also suggest that there was nothing "improper" about broadening the scope of the follow-up

surveys. The ISDH has the authority to conduct surveys whenever that agency deems it necessary. *See* 42 C.F.R. § 488.308; 42 C.F.R. § 488.20(b)(1), (b)(4). Further, federal regulations do not place any limitations on the scope of post-review surveys; when such surveys are performed, the ISDH must determine whether the previous deficiencies have been corrected *and* whether the facility is in "substantial compliance" with federal requirements. *See* 42 C.F.R. § 488.30.

It is, of course, possible that the ISDH has an informal rule regarding cycle-breaking. Legacy believes that it does, and it points to a small portion of Hornstein's testimony, in which she explains her belief that if the new deficiency is different from the old one, two separate cycles should run.[11] Legacy also points to an email sent

---

[11] Hornstein's testimony was as follows:

> Q: I think I can get the cycle thing straight with one more question. Here it is. A facility has a survey and they are out of compliance and [a] 180 day cycle starts.
>
> A: Correct.
>
> Q: The surveyors come back for the [post-review survey] but there's a new complaint and they go to handle both of them in the same survey and the [post-survey review] puts the facility back in compliance. The new complaint, however, takes them out. Now, has the 180 day cycle that began with that first survey stopped or not?
>
> A: Depends.

(continued...)

by an ISDH supervisor to a surveyor, in which the super-visor explains that "[t]he only time surveys should be split is when the [post-review survey] and the [complaint survey] are done together." But even if Hornstein and Wassel accurately described the proper application of the cycle-breaking rule, it would not have applied in Legacy's case. In the hypotheticals offered by Hornstein and Wassel, complaint surveys (a specific type of survey) were distinguished from certification and post-review surveys. In fact, Wassel explained that cycles are broken only when post-review surveys and complaint surveys are done at the same time. The surveys at Portland East in 1997 and 1998, at Portland East in 1999, at Columbus in 1998 and at New Castle in 1998 did not involve complaint surveys that needed to be separated from post-review surveys.[12] While the Portland West survey did involve a complaint investigation, the facility was found

---

[11] (...continued)

    Q:   On what does it depend on?

    A:   On whether the deficiencies were cited in the second survey are the same as the ones that are cited in the [first] survey.

    Q:   What if they are different?

    A:   They should stop and start.

When Hornstein was pressed on the cycle-breaking issue, she stated that she was not certain of the application of the rule because she was not a surveyor.

[12] The actions at Columbus in 1999 and North Vernon in 1998 do not bear upon cycle-breaking at all.

to be in substantial compliance and the cycle was broken. Thus, Legacy has no evidence that the cycle-breaking rule, as explained by Hornstein and Wassel, would have applied in these cases.

The other evidence of dissimilar treatment presented by Legacy is anecdotal and unpersuasive. Legacy discusses two facilities at which it claims the 180-day cycle was properly applied. The first example is Whispering Pines, where the ISDH apparently let the cycle run out because it forgot to do a follow-up survey in time. At Arbors, Bradburn himself said that he could not determine whether the 180-day cycle was ever closed; it is clear, however, that the ISDH initiated an action to revoke Arbor's license. This evidence does nothing to further Legacy's case.

Despite the fact that it does not appear in any state or federal regulation, we are willing to assume that the ISDH did have an informal cycle-breaking rule. But that rule, as Hornstein and Wassel explained, applies only when complaint surveys are conducted alongside post-review surveys. The cycle-breaking rule does not apply when the scope of a post-review survey is broadened (as federal regulations clearly allow). Because the examples cited by Legacy do not involve the situation to which the rule was intended to apply, Legacy has not shown that it has been treated unfairly.

## C.

We turn now to Hornstein's alleged failure to provide

Legacy with a copy of New Horizon's license.[13] Legacy needed a copy of the license to complete its Medicare reimbursement application. Legacy claims that Hornstein "refused" to hand over a copy of the license in an attempt to sabotage Legacy's ability to obtain Medicare reimbursement. Legacy claims that no other licensed facility in Indiana had ever been denied a copy of its license in such a manner.[14] We find, however, that Legacy has failed to establish the factual basis of this claim.

Legacy claims that Hornstein withheld copies of its New Horizon licenses in 1996, 1997, 1998 and 1999. New Horizon was re-certified for Medicaid services, effective July 7, 1997, and a state license was issued for the facility. Legacy intended to use the state license to complete its application for Medicare reimbursement. A copy of the license, however, was never sent to Legacy. Legacy might not even have realized that it needed a copy of the

---

[13] As the district court noted, there is no evidence that Coleman withheld or participated in the withholding of the license—he was merely aware of it, and Legacy has not explained how an awareness of the withholding makes him liable for an equal protection violation. It was Hornstein's responsibility to send the license to Legacy.

[14] Legacy argues that a "comprehensive review of all licensed facilities in the state indicates that no other similarly situated (i.e., licensed) facility was ever denied its physical license," and it also points to the testimony of Hornstein. Despite Legacy's claims, Hornstein never said that no other facility had ever been denied a copy of its license, only that she was not *aware* of one.

license until October 16, 1997, when Administar Federal, the Medicare fiscal intermediary, asked Legacy to submit one. Legacy claims that it contacted "various ISDH and HCFA employees" about the license but it never specifies whom, nor does it provide any proof of these requests. More importantly, Legacy has not explained when—or indeed *if*—it ever actually requested a copy of the license from Hornstein. Legacy claims that it raised the issue in a November 20, 1997 letter to Robert Spain, the program director for the Health Care Financing Administration (HCFA), but a review of that letter reveals otherwise.[15] The record reveals that Spain, whom Legacy trusted and with whom it often communicated, was unaware of the problem until the parties met on July 23, 1998. Indeed, Legacy drafted a list of topics to be discussed with Spain at that meeting but never mentioned the problem with the physical delivery of the license.

Legacy does note, correctly, that the issue was raised in the meeting with Spain, a meeting that Hornstein attended. When Spain asked why Hornstein had not provided a copy to Legacy, Hornstein said that she did not send it because Legacy was "in litigation" over certification. It is unclear what happened next. In a follow-up letter sent to Spain after the meeting, Legacy does not mention the license and instead asks Spain to help ensure that it receive fair inspections in the future.

---

[15] On March 17, 1998, Legacy received a renewal application from the ISDH. The application was processed but, again, Legacy did not receive a copy of its license.

We are not sure what to make of this evidence. It is true that Hornstein seemed to have equivocated in her explanations of why she did not send the license.[16] She first claimed that the license had not been issued because of litigation, and then she claimed that she assumed the license had issued. Her explanations may be explained by the fact that she was referring, in the first instance, to the failure to send the 1996 license and, in the second instance, to the 1999 licenses. The record is not clear on this point.

In the end, we find that Legacy's claim suffers from a fatal lack of detail. Legacy has not established that Hornstein was the only one who could have sent it a copy of the license, nor has it produced any document to show that it ever requested the license from Hornstein. Hornstein may have made a mistake in not issuing the license or may have mistakenly thought that she could have withheld the license. But this evidence, alone, is not enough to draw the grand inference that Hornstein violated Legacy's rights under the Equal Protection Clause. Its claim therefore fails.[17]

---

[16] Hornstein also claims that she would have done anything to revoke the license because the North Vernon facility "could not maintain compliance and could not take care of its residents."

[17] Because there was no constitutional violation in this case, we do not reach the issue of qualified immunity or absolute immunity. *See Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003).

## VI.

For the foregoing reasons, the decision of the district court is AFFIRMED.

POSNER, *Circuit Judge*, concurring. In a series of cases in the 1960s, the Supreme Court held that the First Amendment, particularly the clauses creating a right to petition for redress of grievances and an (implied) right to associate for the advancement of First Amendment interests, forbids the government to impose unnecessary restrictions on an association's assisting its members to litigate claims. *NAACP v. Button*, 371 U.S. 415 (1963); *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1 (1964); *United Mine Workers, District 12 v. Illinois State Bar Association*, 389 U.S. 217 (1967). From those cases, coupled with the rule that government retaliation for the exercise of First Amendment rights is itself a violation of the First Amendment, e.g., *Wilkie v. Robbins*, 127 S. Ct. 2588, 2600-01 (2007); *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir. 2002), overruled on other grounds by *Spiegler v. Hall*, 371 F.3d 928, 941-42 (7th Cir. 2004); *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000), it might appear to follow that if government officials retaliate against someone for bringing a lawsuit, as charged in this case, they have violated the First Amend-

ment. And so the parties and the district judge have assumed. I have my doubts, although I do not criticize the majority opinion (which I join) for deciding the case on the basis of the assumption.

The *Button* case was "cause" litigation—the NAACP was using constitutional litigation as an alternative to legislative reform of discriminatory practices; it thus was petitioning for redress of grievances, rather than suing to enforce a private right. The other cases that I have cited involved challenges to state bar regulations that restricted access to the courts, as by preventing a union from providing a lawyer for a member of the union who might not be able to afford to hire one; and so they merge with cases like *Bounds v. Smith*, 430 U.S. 817 (1977), that create a broad right, based on various constitutional provisions, of access to the courts.

This case is different. The defendants did nothing to obstruct Legacy Healthcare's access to the Indiana courts to litigate its Medicaid reimbursement claims against the state. Of course, if a defendant puts up a fierce resistance to a lawsuit, it makes plaintiffs' recourse to the courts less attractive. But a plaintiff has no more right to demand that the defendant roll over and play dead than the defendant has a right to demand this of the plaintiff. And I don't think that anyone has ever thought that merely because a defendant goes overboard—by committing perjury, tampering with witnesses, even bribing judges or jurors—it has (if it is a government agency or official rather than a private person) violated the plaintiff's right of access to the courts, or his right to petition for redress of grievances. Why should it matter whether the defen-

dant's over-the-top opposition comes before or after the plaintiff's suit ends?

There are plenty of remedies for overreacting to litigation or the threat of litigation, remedies that make it unnecessary to drag in the heavy artillery of constitutional tort litigation under 42 U.S.C. § 1983. There are for example the numerous federal statutes that forbid retaliation against a person who files a statutory claim. For example, Title VII of the Civil Rights Act of 1964 forbids "an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice" that violates the statute or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the statute. 42 U.S.C. § 2000e-3(a). If the parties to this case are correct, it would seem to imply that such statutory provisions, and the case law they have accreted, are superfluous when the alleged retaliation is by a government official because such retaliation could be litigated directly under section 1983 as a violation of the Constitution.

In fact this route is closed off by *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981), which holds that "when the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id*. at 20. As we explained the background of the *Sea Clammers* doctrine in *Delgado v. Stegall*, 367 F.3d 668, 673 (7th Cir. 2004) (citations omitted), "The plaintiffs in that case sought relief from pollution against state officials under

federal statutes that provided comprehensive and fully adequate remedies. The Supreme Court had recently held, however, that section 1983, though typically used to enforce federal constitutional rights, reaches infringements of federal statutory rights as well. This ruling opened up the possibility that anyone who had a federal statutory remedy for a harm inflicted under color of state law could tack on a claim for relief under section 1983 as well . . . . [T]he Court held that section 1983 was not an available alternative because 'it is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies.' The completeness of those remedies showed that Congress 'intended to supplant any remedy that otherwise would be available under § 1983.'" See also *Wright v. City of Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 423-29 (1987); *Blessing v. Freestone*, 520 U.S. 329, 346-48 (1997); *Williams v. Wendler*, 530 F.3d 584, 586 (7th Cir. 2008); *Williams ex rel. Hart v. Paint Valley Local School District*, 400 F.3d 360, 363, n. 1 (6th Cir. 2005).

The *Sea Clammers* doctrine is not applicable to this case because Legacy Healthcare's suit—the suit that provoked the alleged retaliation—was not a federal suit. But the thinking behind the doctrine is. Legacy Healthcare accuses the defendant officials of conspiring to put it out of business by making false charges (for example of improper diversion of Medicaid funds), denying it licenses without cause, and discriminating in favor of its competitors. There are remedies under state law against such official misconduct. No reason is given for thinking that Legacy Healthcare needs to get into federal court

under federal law—let alone the First Amendment—in order to protect itself. It is not as if the suit that called down the wrath of the defendants had been a federal suit, in which event there might be a concern that a state court would not be sympathetic to protecting the plaintiff against retaliation by state officials.

I am mindful of cases that hold that retaliation against a prisoner's filing a grievance can violate the prisoner's First Amendment rights, e.g., *Hasan v. United States Department of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005), and cases cited there; *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004), but I think those cases read "petition the Government for redress of grievances" (the language of the First Amendment) too literally. Every grievance, charge, or complaint filed against a government agency seeks redress, but does this mean that the government cannot limit the right to sue itself without shouldering the heavy burden of justification that the First Amendment has been interpreted to place on anyone who seeks to deny an assertion of a First Amendment right? The answer cannot be yes. Such limitations are legion and rarely challenged. The Supreme Court said in *Hudson v. Palmer*, 468 U.S. 517, 523 (1984), that "like others, prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a *reasonable* right of access to the courts" (emphasis added). Legacy Healthcare had reasonable access to the courts to litigate its claim against the state for Medicaid reimbursement, and, as far as I can tell, it has reasonable access to the courts to litigate its opposition to the alleged harassment by the defendants. I conclude that there has been no infringement of

its constitutional right of access to the courts to petition for redress of grievances and hence no basis for a suit premised on such an infringement.

And I add that the practical objections to the interpretation of constitutional tort law offered in this case are compelling. For on that interpretation every successfully litigated claim (and many failed claims as well) against a state or federal agency would set the stage for a federal constitutional suit, should the subsequent relations between the plaintiff and the agency sour, as they are quite likely to do in the wake of a successful suit against the agency. Defendants are not kindly disposed to plaintiffs, especially plaintiffs who beat them. But if they retaliate, at least in the manner charged in this case, they hand plaintiffs additional legal weapons, with various limitations that deeming the retaliation unconstitutional might destroy. There is no need to take that further step beyond *Button*, *Trainmen*, *United Mine Workers*, and *Bounds*.