# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 7, 2017        Decided August 15, 2017

No. 15-1449

SECURITYPOINT HOLDINGS, INC.,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order of the
Transportation Security Administration

*Bradley C. Graveline* argued the cause and filed the briefs for petitioner.

*John S. Koppel*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General at the time the brief was filed, and *Mark B. Stern*, Attorney.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*:  SecurityPoint Holdings, Inc., which contracts with airports to participate in an advertising program established by the Transportation Security Administration, again petitions for review of the agency's decision to revise its memorandum of understanding (MOU) used with participating airports.  On remand after this court's decision in *SecurityPoint Holdings, Inc. v. TSA*, 769 F.3d 1184 (D.C. Cir. 2014) (*SPH I*), the agency again declined SecurityPoint's request that it cease using the revised MOU.  SecurityPoint's petition challenges the TSA's decision as arbitrary and capricious and as an act of retaliation that violates its rights under the First Amendment to the Constitution of the United States.  For the reasons that follow, we deny the petition.

## I. Background

SecurityPoint is the owner of a method patent covering, as relevant here, the practice of placing onto a cart bins that have passed through an x-ray screening machine at an airport security checkpoint and pushing the cart back to the front of the machine so the bins can be used by the next passengers to go through the checkpoint.  According to SecurityPoint, the TSA uses its patented system to help screen passengers at over 400 airports throughout the United States.  At about 40 of those airports, SecurityPoint participates in the TSA's "Bin Advertising Program."  Under that program, an "advertising broker" such as SecurityPoint

> assume[s] the costs of providing and maintaining certain checkpoint equipment – bins, wheeled carts to transport the bins, and tables – in exchange for the right to sell advertisements to be displayed inside the bins. Participating airports execute [an MOU] with

TSA; they then contract with private companies to obtain the equipment subject to the MOU's terms.  Once TSA has adopted a new MOU template, it requires all participating airports entering into new contracts under the program to use that template…. The advertising revenues, though shared by the airport operators and private companies, relieve TSA of the expense of supplying the bin-related equipment.

*SPH I*, 769 F.3d at 1186.

SecurityPoint concedes that, at airports where it is the advertising broker, the TSA may practice the patent through what the Company calls an "implied license" arising from its agreement with the airport.  The TSA, consequently, does not have a license to practice the patent at airports that do not participate in the Bin Advertising Program with SecurityPoint.

In 2011 the Company sued the TSA in the Court of Federal Claims, alleging patent infringement at approximately 400 U.S. airports with which SecurityPoint had not contracted to participate in the Bin Advertising Program.  The parties agreed to bifurcate the liability and damages phases of the case and the TSA conditionally stipulated to infringement at ten large airports.  The court then held the patent was valid, rejecting the TSA's argument that the invention was "obvious" and therefore not patentable.  *SecurityPoint Holdings, Inc. v. United States*, 129 Fed. Cl. 25, 28 (2016).  The TSA appealed that decision to the Federal Circuit, but its appeal was dismissed as premature. *SecurityPoint Holdings, Inc. v. United States*, No. 17-1421 (Fed. Cir. Mar. 9, 2017) (because order did not resolve TSA's liability at all U.S. airports, it was not final and reviewable).  The Court of Federal Claims has not yet

determined whether the TSA infringed the patent at other airports.

This case arises from prospective changes to the MOU that the TSA made in 2012. Two additions to the MOU are relevant here. One "require[s] participating airports to indemnify TSA from all liability for intellectual property claims related to the checkpoint equipment." *SPH I*, 769 F.3d at 1186. The other provides that "on cancellation of an agreement between an airport and a private company [i.e., an advertising broker such as SecurityPoint], TSA would retain the right to use the checkpoint equipment as well as a license to all intellectual property necessary for such use." *Id*. at 1186-87.

Unhappy with these changes, SecurityPoint asked the TSA to "cease and desist" from using the revised MOU, which it claimed the agency revised in retaliation for SecurityPoint's having sued it for patent infringement. In its letter request, SecurityPoint argued the indemnity provision was a "poison pill" that would make it "impossible" for any additional airports to enter the Bin Advertising Program. In this regard, the Company pointed out that the fewer the airports contracting with SecurityPoint to participate in the Bin Advertising Program, the less the TSA would benefit from the implied license to use SecurityPoint's patented system and from SecurityPoint's provision of free checkpoint equipment. The letter also listed four airports – St. Louis, San Jose, San Antonio, and Boston – where SecurityPoint claimed the new MOU had prevented deployment of the agency's Bin Advertising Program.

The TSA rejected SecurityPoint's demands, stating the

> revisions to the MOU are based on prudent
> business practices to protect [the agency] from

legal liability that could arise from the use of checkpoint furnishings provided by airport operators, and to ensure that agency activities are not disrupted by the termination of business relationships between the airport operator and advertising broker.

The TSA added that 14 airports had entered into MOUs since the filing of SecurityPoint's patent case against the agency.

SecurityPoint petitioned this court for review of the TSA's response, arguing the agency's revision of the MOU was (1) arbitrary and capricious, in violation of the Administrative Procedure Act, and (2) done in retaliation for the Company having sued it in Claims Court, in violation of SecurityPoint's right of petition guaranteed by the First Amendment. After the court determined the TSA's letter was a reviewable "order" under 49 U.S.C. § 46110(a), it held the TSA's letter decision violated the APA for two reasons. *SPH I*, 769 F.3d at 1187. First, it did not provide "a brief statement of the grounds for denial," as required by 5 U.S.C. § 555(e). *Id*. at 1188. Second, it was arbitrary and capricious because the agency had not "'consider[ed] an important aspect of the problem' before it." *Id*. at 1189 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Specifically, the TSA had not addressed SecurityPoint's argument that, if an airport did not agree to the new provisions, then using the new MOU would impose opportunity costs upon the TSA, i.e., loss of the implied license and of free checkpoint equipment, without creating any benefit in reducing its legal liability beyond what the implied license already provided under the Bin Advertising Program at those airports that did agree to the MOU. *Id*. at 1188. The court also concluded the number of airports that had entered into an MOU after SecurityPoint filed its patent infringement suit was not

"responsive" to the question whether airports found it impossible to agree to the new MOU; the relevant datum was the number of airports that had entered into the new MOU. *Id*. The court therefore vacated the letter decision and remanded the matter to the agency without reaching SecurityPoint's constitutional claim. *Id*. at 1189.

SecurityPoint then again asked the TSA to refrain from using the revised MOU. The Company reiterated its concern that airports would not agree to the new provisions and, as evidence of retaliation, provided email correspondence from a TSA employee managing the Bin Advertising Program. SecurityPoint proposed that, in place of the indemnity, the TSA require each airport to obtain from its advertising broker (such as SecurityPoint) a "covenant not to sue" the TSA for violating the broker's intellectual property.

The TSA again denied SecurityPoint's request, but it did revise the MOU in an effort, it says, to address the Company's concerns. The newly revised MOU keeps the original indemnity requirement, but also provides an alternative option under which an airport need not itself indemnify the Government but must require any advertising broker (such as SecurityPoint) with which it contracts to indemnify the Government.

The TSA's letter explained that its "revision of the MOU template was part of a comprehensive review of TSA agreements to ensure the inclusion of appropriate intellectual property provisions by a newly hired TSA Intellectual Property Attorney." The new indemnity provision would address those concerns in any newly signed MOU but would not disturb existing MOUs. The TSA denied that the provision prevented airports from signing the new MOU, citing four airports that had signed it: Boston Logan International Airport, Durango La-

Plata County Airport, Greater Rochester International Airport (NY), and Rochester International Airport (MN). Furthermore, the agency concluded that any decreased participation in the Bin Advertising Program would not significantly raise the agency's operating costs, largely because fewer than 50 of the 450 U.S. airports had participated in the program. The agency also explained the cost of replacing bins and carts as they wear out would be much less than the potential cost of patent liability arising from use of the equipment. Finally, the TSA said the new option allowing a broker to indemnify the TSA addressed SecurityPoint's concern that some airports were precluded by state law from doing so.

## II. Analysis

SecurityPoint again challenges the TSA's decision as both arbitrary and capricious and a violation of the First Amendment.

### A. Arbitrary and Capricious Review

SecurityPoint argues the TSA's decision is arbitrary and capricious because the agency did not engage in reasoned decision making.

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency … [but] the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*State Farm*, 463 U.S. at 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). As we said

in our previous decision, 769 F.3d at 1187, the court must vacate a decision that "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43.

In the TSA's 2015 letter on review here, the agency reiterated the argument it made in 2013 that it adopted the indemnity provision "to protect itself from legal liability that could arise from the use of checkpoint furnishings provided by airport operators." In *SPH I* we concluded that this was insufficient to explain why the agency was willing to accept the costs it would incur, without apparent benefit, by using the new MOU. 769 F.3d at 1188. In particular, we concluded the agency did not respond to SecurityPoint's contention that airports would not agree to the new MOU, thereby shifting the costs of providing checkpoint equipment onto the TSA for airports that would have participated in the Bin Advertising Program but for the indemnity provision in the MOU. *Id*. Moreover, we noted, the agency entirely failed to consider SecurityPoint's argument that, because participation in the program gives airports an "implied license" to use its patent, the revision of the MOU provides no additional benefit to the agency. *Id*. SecurityPoint's 2015 letter to the TSA and its brief in this appeal once again raise the arguments it made in *SPH I*. In our view, however, the agency's response on remand shows that the new provisions of the MOU were the product of reasoned decision making.

SecurityPoint's arguments depend upon its assertion that most airports will not agree to the new MOU. Insofar as airports do accept the new MOU, however, the TSA will not incur the costs SecurityPoint says it will incur. On remand, the TSA noted four airports have agreed to the new MOU. This group includes Boston Logan International Airport, the largest

of the four airports SecurityPoint argued in its 2012 letter to the TSA could not agree to the new MOU. SecurityPoint argues the other three airports are too small for their participation to undercut SecurityPoint's concern. Nonetheless, the agency's evidence shows it is not "impossible" for airports to agree to the new provisions. Although we previously rejected as "*de minimis*" the TSA's observation that Durango La-Plata County Airport had signed the new MOU, *SPH I*, 769 F.3d at 1189, one large and three small airports are not "*de minimis*."

Nonetheless, SecurityPoint now points to five "nearly-consummated deals that had been negotiated for years" but which "fell apart as a direct result of the indemnification provision" as evidence, unaddressed by the TSA, "that many airport[s] … are prohibited by law from" accepting the new MOU. In response, the TSA explains the record shows only that one of the five (Atlanta Hartsfield) is legally prohibited from entering into indemnity agreements. Although, as SecurityPoint correctly notes, "the overwhelming majority of U.S. airports have not executed the [revised] MOU," the great majority of U.S. airports had not signed the previous MOU, making implausible the Company's suggestion that the new provisions are precluding widespread participation.

Faced with proof that airports can agree and that some indeed have agreed to the new MOU, SecurityPoint contends not "even a single airport has actually" contracted for SecurityPoint's services under the Bin Advertising Program since the introduction of the new MOU. That no new airports have contracted with SecurityPoint does not imply it is impossible for airports to accept the new MOU. The record simply does not show why none of the four airports that have signed the new MOU has contracted for SecurityPoint's services.

SecurityPoint next argues that its reduced business will ultimately harm the agency, which brings us to the rationality of the agency's balancing of the expected costs and benefits of using the new MOU. Assuming there are some airports that in time would have agreed to the old MOU but have not agreed to the new MOU, the TSA has sufficiently explained why it accepted this risk: Its potential liability in patent infringement suits – recall that SecurityPoint is suing it for $380 million – exceeds the cost of "bins, carts, and tables [which] are fairly inexpensive to purchase." SecurityPoint in response cites the high cost of equipment used in a pilot of the program at 14 airports and faults the agency for failing to consider "the total equipment cost savings that would have resulted" from the Company's participation in the program. The TSA persuasively responds that even if an airport chose not to enroll in the program because of the new MOU, the agency would bear only the long term replacement costs of the equipment already in use there.

Beyond equipment costs, SecurityPoint argues the agency will forgo certain "efficiency gains" if it does not benefit from an implied license to practice the Company's patent on the use of bins and carts, such as fewer workplace injuries than occur when employees carry the bins. As the agency explained in its letter, however, it will not forgo any of these savings because it will continue to use the bins and carts at all airports where they are now in use, regardless whether an airport participates in the Bin Advertising Program. Insofar as it may incur additional liability for patent infringement, the TSA is taking its chances in the patent litigation. In the meantime, the new indemnity provision better protects the agency against future legal liability than would the "implied license" from SecurityPoint because, as the agency notes, that license "provides no protection against potential liability with respect to other patents, or even with respect to [SecurityPoint's]

Patent at airports that participate in the Program but use the services of another advertising broker."

SecurityPoint claims there is no need for the broad intellectual property provision the TSA now seeks because the agency "has failed to cite any other intellectual property that it could arguably infringe." The TSA in its 2015 letter pointed out that the indemnity provision protects it from all possible intellectual property liability, not just from infringement of currently known patents, thereby responding to SecurityPoint's assertion that the agency "ignored the existence of an implied license." Indeed, the implied license, unlike an indemnity, would be inapplicable if an airport used any advertising broker other than SecurityPoint, the patent holder.

The TSA's position is not irrational merely because the agency has not identified a specific patent it is or might be infringing. Although SecurityPoint is correct that the risk of there being unknown patents existed when the original MOU was drafted, it was not irrational for the agency to address that risk later, when it first got the advice of counsel.

SecurityPoint attempts to undermine the TSA's justification – its desire to avoid unwittingly infringing others' patents – by arguing the TSA buys equipment directly for nonparticipating airports without first determining "whether the equipment it purchases directly infringes any patents." Even if that is true, the agency, as it explained, is "ill-positioned to ensure that no equipment or process provided" to it under the Bin Advertising Program "infringes on a patent." With regard to SecurityPoint's method patent in particular, the revised indemnity provision places the burden of ensuring noninfringement upon the airport or the advertising broker, the parties best positioned to avoid infringements, and therefore is

more efficient than the implied license or SecurityPoint's proposed "covenant not to sue."

SecurityPoint next turns from the reasonableness of the new MOU in the abstract to its practical implications in light of SecurityPoint's infringement suit against the TSA. Because the TSA stipulated to infringement in that suit (albeit for only ten airports), SecurityPoint argues no airport using another advertising broker, which could not grant the implied license to its patent, would agree to indemnify the TSA. Neither, it says, would another advertising broker, operating under the alternative indemnity provision, do so. As the TSA observes, however, the Company "points to no evidence in the administrative record to support a finding that advertising brokers themselves would be unable to agree to the Indemnity Provision." In any event, SecurityPoint's concern in this regard is puzzling: If the new provision discourages the use of all other advertising brokers, then the provision benefits SecurityPoint. If another advertising broker nonetheless joins the program, then SecurityPoint will still receive the benefit of its intellectual property: That other broker or the airport must either get a license from SecurityPoint – on SecurityPoint's terms – or indemnify the TSA against liability for infringement of the patent.[1]

We therefore hold the agency's decision was not arbitrary and capricious but rather demonstrated a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). Unlike the TSA's 2013 letter, its 2015 letter also provides the "brief

---

[1] SecurityPoint has in fact previously sued another advertising broker for infringement. *See SecurityPoint Media, LLC v. The Adason Grp., LLC*, No. 8:07-cv-444-T-24TGW, 2007 WL 2298024 (M.D. Fla. Aug. 7, 2007). Per the parties here, that case was settled.

statement of the grounds for denial" required by 5 U.S.C. § 555(e); it fully explains "why [the agency] chose to do what it did." *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (internal quotation marks omitted).

## B. Right to Petition

Lastly, SecurityPoint argues the TSA unlawfully retaliated against it for bringing its infringement suit against the agency, in violation of the First Amendment. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed . . . one aspect of the right of petition" protected by the First Amendment). Accordingly, SecurityPoint asks us to vacate the agency's decision because it is, in the words of the APA, "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see Trudeau v. FTC*, 456 F.3d 178, 188-90 (D.C. Cir. 2006).

In order to determine whether the TSA unlawfully retaliated against SecurityPoint, we must decide under what standard to assess the agency's actions. SecurityPoint urges us to apply the test for establishing a "prima facie case" of government retaliation against a regulated entity for its protected speech, as articulated by the Seventh Circuit in *Woodruff v. Mason*, 542 F.3d 545, 551 (2008). Under that test, SecurityPoint must show:

> (1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was "at least a motivating factor" in the [Government's] decision to take the retaliatory action.

*Id*.; *see also Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) (applying a similar test to alleged retaliation by the District when its child welfare agency temporarily removed children after parents engaged in protected conduct). The TSA, for its part, argues the four-factor test developed in *Pickering* and its sequellae, which test applies to retaliation claims by public employees or contractors, is the correct test because SecurityPoint is in effect a government contractor. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568-75 (1968); *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 673 (1996) (applying *Pickering* to government contractors).

We need not resolve the choice of tests because the TSA prevails even under the test preferred by SecurityPoint. Nor need we engage with the first and second *Woodruff* requirements because it is apparent, as the TSA urges, that the facts before us do not establish the necessary third element of motivation.

In order to show the TSA modified its template for MOUs in retaliation for SecurityPoint's having sued the agency, the Company relies upon emails from Arthur Drenth, the TSA official who SecurityPoint describes as "in charge of disseminating and explaining the [n]ew MOU … nationwide." SecurityPoint makes much of the email message Mr. Drenth sent to two TSA staff members at Boston Logan transmitting the new MOU and telling them to inform the airport about the problem of liability for patent infringement. That email, however, shows nothing more than the TSA's effort to inform the airport that it may incur liability for inducing the TSA to infringe SecurityPoint's patent, the very concern the TSA says motivated the new provisions.

SecurityPoint also points out that Mr. Drenth, responding to a TSA employee who was skeptical Boston Logan would

sign the new MOU, wrote: "My understanding is the entire thing could be resolved if [SecurityPoint] granted a nationwide license for use of the patent." Finally, SecurityPoint points to an email from Mr. Drenth to a TSA staff member at Boston Logan, in which he stated:

> These guys from [SecurityPoint] are trying to push the envelope and may have gotten a little ahead of themselves. In my personal opinion it is all a rather silly exercise but we have to draw the line somewhere no matter how much we like the program we are not going to be pushed around by them on this stuff.

These statements may seem at least to hint at retribution but, as SecurityPoint acknowledges, when communicating with the Company's CEO, Mr. Drenth also said: "I was told specifically that these edits are related to material that really ought to have been included in the MOU from the very start of the program." Read in light of the latter statement, Mr. Drenth's "personal opinion" or "understanding" does not imply the TSA modified the MOU in order to retaliate against SecurityPoint but rather to address newly appreciated risks of liability for infringing intellectual property rights.

Furthermore, the TSA says Mr. Drenth "had no involvement in formulating or drafting the revisions" to the MOU, which were instead formulated by the agency's new intellectual property counsel "as part of a comprehensive review of legal documents to ensure the inclusion of appropriate intellectual property provisions." Indeed, Mr. Drenth's allegedly problematic emails were sent after the adoption of the new MOU.

We read Mr. Drenth's emails bearing in mind that the TSA's revision of its MOU was not arbitrary and capricious. The emails, which range from innocuous to, at worst, ambiguous, do not show the TSA's decision was an attempt to punish SecurityPoint for having sued the agency.

## III. Conclusion

The TSA's decision was neither arbitrary and capricious nor a violation of SecurityPoint's right to petition, protected by the First Amendment. Therefore, SecurityPoint's petition for review is

*Denied*.