NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-3610 and 20-3614
_____

FRANK NOONAN; RANDY FEATHERS; RICHARD A. SHEETZ, JR.; E.
MARC COSTANZO; FRANK FINA,
Appellants

v.

KATHLEEN KANE; MICHAEL MILETTO; CHRISTOPHER BRENNAN;
PHILADELPHIA DAILY NEWS; PHILADELPHIA MEDIA NETWORK (DIGITAL)
LLC; PHILADELPHIA MEDIA NETWORK, LLC

E. Marc Costanzo,
Appellant in No. 20-3610


FRANK NOONAN; RANDY FEATHERS; RICHARD A. SHEETZ, JR.; E.
MARC COSTANZO; FRANK FINA

v.

KATHLEEN KANE; MICHAEL MILETTO; CHRISTOPHER BRENNAN;
PHILADELPHIA DAILY NEWS; PHILADELPHIA MEDIA NETWORK (DIGITAL)
LLC; PHILADELPHIA MEDIA NETWORK, LLC


Frank Noonan; Randy Feathers; Richard A. Sheetz, Jr.; Frank Fina,
Appellants in No. 20-3614
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Civ. No. 2-15-cv-06082)
District Judge: Honorable Harvey Bartle, III
_____

Before: GREENAWAY, JR., KRAUSE, and PHIPPS, *Circuit Judges*.

(Opinion Filed: July 12, 2022)

_____

OPINION[*]
_____

GREENAWAY, JR., *Circuit Judge*.

The genesis of this dispute, between an elected official and former government employees who disagreed with her, is a war of words waged in the press—that is to say, politics as usual. Because the objectionable conduct took the form of statements to the media, liability will attach only if the public officials who are defendants in this case imposed or threatened official action. The District Court determined, and we agree, that the Appellants either failed to allege such actions or failed to adduce evidence to satisfy this burden. Accordingly, we will affirm the District Court's partial grant of Appellees' motion to dismiss and grant of summary judgment in Appellees' favor.

## I. BACKGROUND

This appeal arises out of claims by former employees of the Office of the Attorney General of Pennsylvania (the "OAG") that the former Attorney General, Kathleen Kane,

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

and an investigator in the OAG, Michael Miletto, retaliated against them for exercising their First Amendment rights to criticize Kane in the press and testify before a grand jury.

Appellants Frank Noonan, Randy P. Feathers, Richard A. Sheetz, Jr., E. Marc Costanzo, and Frank G. Fina were previously employed by the OAG as law enforcement officers or prosecutors. Appellants were all, in one way or another, involved in the OAG's investigation of child sexual abuse perpetrated by a Pennsylvania State University football coach, Jerry Sandusky.

Kane, in her 2012 campaign for Attorney General, made statements critical of the Sandusky investigation and promised to conduct an independent inquiry into the investigation if she were to be elected. Those statements became the opening volleys of a heated battle between Kane and Appellants. Apparently in response to criticism from Appellants in the media, Kane engaged in a retaliatory campaign against them that included making defamatory statements in the media, conducting internal investigations of matters Appellants worked on, allegedly directing current and former employees of the OAG to deliver threats to Appellants, and ultimately disclosing to the media sealed grand jury materials.

## A. KANE'S STATEMENTS AND OAG INVESTIGATIONS OF APPELLANTS

After taking office, Kane appointed H. Geoffrey Moulton, Jr., to review the OAG's investigation of Sandusky. During his investigation, Moulton discovered a cache of pornographic emails exchanged among OAG employees assigned to the Sandusky investigation. These emails, Appellants allege, were later wielded against them in an attempt to secure their silence. The OAG published Moulton's report on June 23, 2014,

3

with no mention of the emails.  At a press conference held the same day, Kane falsely suggested that the pace of the Sandusky investigation permitted Sandusky to abuse two other victims.

Unlike the other Appellants, Fina's term in the OAG overlapped with Kane's for three days.[1]  In that brief time, Fina did the following—he alerted Kane to her potential conflict of interest with an ongoing investigation of members of the Pennsylvania General Assembly and advised her to recuse herself.  Kane declined to recuse herself, did not bring forth any charges in connection with the investigation, and directed a review of the investigation.  In statements to the press, Kane criticized the investigation as, among other things, being tainted by racial targeting of Black legislators.

A March 16, 2014 article in the Philadelphia Inquirer identified a confidential source in the investigation and published Kane's purported conflict of interest.  Fina's prior comments about the case were quoted in the March 16 story and he responded to Kane's criticism by challenging her to a public debate on the facts.  In email correspondence about the March 16 story, Kane declared to her outside media consultant that she would not allow those involved with the story to discredit the OAG and that the story signaled "war."  The consultant responded that Kane would be wise to wage war with Fina and not the Inquirer.

On March 19, 2014, Miletto relayed to David Peifer, Special Agent in Charge of the Bureau of Special Investigations in the OAG, that he knew of an investigation that

---

[1]  Before Kane took office, Noonan, Feathers, Sheetz, and Costanzo had all left the OAG.

4

would also receive media coverage. On March 21, Peifer met with Miletto at Kane's request. Miletto relayed information about an aborted grand jury investigation into allegations of financial impropriety by the then-head of the Philadelphia Chapter of the NAACP, J. Whyatt Mondesire, in connection with a state-funded job training program (the "CUES-Mondesire investigation").[2]

Kane, through a subordinate, handed over documents relating to the CUES-Mondesire investigation to Christopher Brennan of the Philadelphia Daily News. Brennan used the documents to write an article which appeared on June 6, 2014. These documents included confidential material from a grand jury inquiry into the matter. Appellants allege that this article was published at Kane's direction and was written to suggest that they improperly terminated the CUES-Mondesire investigation.

In early July, the OAG began to receive Pennsylvania Right-to-Know-Law ("RTKL") requests for the pornographic emails discovered during Moulton's investigation. Several of these requests asked for the emails of specific OAG employees, including Fina, Noonan, Feathers, and Costanzo. Multiple reporters reached out to Fina, advising him that the OAG had suggested the media file RTKL requests for Appellants' emails.

The OAG retained an outside attorney, Sara Yerger, to review the RTKL requests. That September, Yerger sent letters to reporters denying the RTKL requests. On

---

[2] Miletto led the investigation and clashed with Fina and Costanzo over their failure to bring charges against Mondesire. Miletto was subsequently transferred out of the Criminal Prosecutions section of the OAG.

September 23, 2014, Kane emailed her media consultant an article reporting the denial of the RTKL requests by Yerger. Kane subsequently authorized the release of certain emails to the press, notwithstanding Yerger's determination that the OAG was permitted to deny the requests, on September 25, 2014. The emails were selectively redacted to conceal the names of senders and recipients. The names of Noonan, Feathers, and Sheetz were not redacted, but the names of Fina and Costanzo were.[3] In a nationally televised interview, Kane falsely suggested that the emails contained child pornography.

## B. THREATS AND CONFRONTATIONS

Former Chief Deputy Attorney General Glenn Parno became aware of Moulton's discovery of the emails sometime in February or March 2014. In August 2014, Parno learned from Chief Deputy Attorney General of Appeals James Barker that Kane had intended to release the emails because of Fina's comments to the press. Barker also told Parno to reach out to Fina and encourage him to stop speaking with the press.

Chief Deputy Attorney General of Operations David Tyler also spoke with Parno and advised him that Kane would release the emails because of the animosity between her and Fina. Parno, however, did not relay this information to Fina. Tyler also spoke with former OAG employee Christopher Carusone, asking him to tell Fina to agree to a

---

[3] On August 26, 2015, the Supreme Court of Pennsylvania unsealed the records of the grand jury investigating Kane's leak of the CUES-Mondesire grand jury material, including 20 email chains containing pornographic material. A subsequent OAG investigation and report detailed 11,930 inappropriate emails sent by more than 370 OAG employees and 25 Pennsylvania judges and judiciary employees. All Appellants received some of these emails, while Feathers, Sheetz, and Fina forwarded some of these emails.

truce with Kane or "[p]eople are going to get hurt." A64. Carusone relayed his conversation with Tyler to Fina.

On August 26, 2014, Fina and Costanzo arrived in Norristown to testify before a grand jury investigating the leak of CUES-Mondesire grand jury materials to the Daily News. Miletto was working in the OAG's office in the same building. As Fina and Costanzo walked into the building lobby, Miletto and three other men, including two OAG agents, began following them. Fina turned to Miletto and asked "[w]hat's up, Mike?" to which Miletto responded "I don't know, Frank. You tell me. The sky? The moon? The star[s]? That's what's up." Fina, Costanzo, Miletto, and the three others stepped onto the elevator. Miletto and Fina stood nose-to-nose but no physical contact occurred. Appellants maintain that all of these incidents occurred at Kane's direction to prevent them from exercising their First Amendment rights.

## C. GRAND JURY INVESTIGATION

After learning of the June 6, 2014 story in the Daily News, Fina and Costanzo brought the matter to the attention of Montgomery County Court of Common Pleas Judge Carpenter, who was supervising the Statewide Investigating Grand Jury. Judge Carpenter informed First Deputy Attorney General Bruce Beemer and appointed a special prosecutor to investigate the leak of the CUES-Mondesire grand jury materials. A grand jury was empaneled, and, in July 2014, the special prosecutor subpoenaed Fina and Costanzo in connection with the investigation.

Fina then reported to the special prosecutor that Kane had threatened to release his personal emails to the media as a result of his cooperation with the grand jury

7

investigation. On August 25, 2014, Judge Carpenter held an *in camera ex parte* hearing after the special prosecutor shared what he knew from Fina. Fina relayed to Judge Carpenter his conversations with Carusone and two reporters who had advised him of the OAG's recommendation that the press file RTKL requests.

On August 26, just after the encounter with Miletto on the elevator in Norristown, Fina and Costanzo disclosed the incident to the special prosecutor. On August 27, the day after the elevator incident, without another hearing discussing the interaction among Fina, Costanzo, and Miletto, Judge Carpenter issued a protective order against the OAG in connection with the grand jury's investigation. The OAG filed a motion for reconsideration and Judge Carpenter scheduled a hearing for October 17, 2014.

On October 17, 2014, Judge Carpenter held two hearings on the motion for reconsideration. Judge Carpenter declined to issue subpoenas to Fina or Costanzo, to take testimony from the special prosecutor, or to share with the OAG a transcript of the August 25 hearing taking testimony from Fina. Chief Deputy Attorney General Barker, however, did submit evidence and testify about the emails discovered in Moulton's investigation and the RTKL requests relating to those emails.

On October 30, 2014, Judge Carpenter entered an order denying the OAG's motion for reconsideration, keeping the protective order in place. At the direction of the Supreme Court of Pennsylvania, Judge Carpenter subsequently filed an opinion detailing his reasoning for the protective order.

The grand jury recommended the following charges against Kane: (1) perjury, 18 Pa. Cons. Stat. § 4902; (2) false swearing in an official proceeding, 18 Pa. Cons. Stat. §

8

4903(a); (3) obstructing the administration of law or other governmental functions, 18 Pa. Cons. Stat. § 5101; (4) official oppression, 18 Pa. Cons. Stat. § 5301; and (5) contempt of court, 18 Pa. Cons. Stat. § 4549. The Montgomery County District Attorney filed a criminal complaint against Kane on the first four recommended charges of the grand jury, and an additional charge of conspiracy to commit official oppression, 18 Pa. Cons. Stat. §§ 903 and 5301.

On August 15, 2016, a jury returned a guilty verdict against Kane for every offense charged. Kane resigned as Attorney General effective August 17, 2016.

## II.     PROCEDURAL HISTORY

Appellants filed this action on November 12, 2015. Appellants filed the operative, first amended complaint on February 26, 2016. The first amended complaint alleged six instances of First Amendment retaliation and sought relief pursuant to 42 U.S.C. § 1983.[4] Count One alleged that Kane retaliated against Fina by publicly accusing him of racism in connection with the investigation into the Pennsylvania General Assembly. Count Two alleged that Kane retaliated against Fina and Costanzo when she told the press that they had improperly terminated the CUES-Mondesire investigation. Count Three alleged that Kane and Miletto conspired to defame Fina and Costanzo with respect to the CUES-Mondesire investigation. Count Four alleged that Kane retaliated against Fina, Sheetz, Feathers, and Noonan by falsely claiming that delays in the Sandusky investigation resulted in two more abuse victims. Count Five alleged that Kane retaliated against Fina,

---

[4] The amended complaint also raised claims of defamation and false light. Those claims are not at issue in this appeal.

9

Sheetz, Feathers, and Noonan when she implied to the press that child pornography was discovered in the emails of former OAG employees.  Finally, in Count Six, Appellants alleged that Kane retaliated against them by releasing their private emails despite the OAG's previous denial of RTKL requests.

Appellees filed motions to dismiss.  The District Court dismissed all the First Amendment retaliation claims in Appellants' complaint for failure to state a claim. *Noonan v. Kane*, 698 F. App'x. 49, 52 (3d Cir. 2017).  We reversed and remanded the matter to the District Court, concluding that Appellants' allegations that (1) Kane had directed a deputy to threaten Fina with release of the emails; (2) Kane's staff had threatened to hurt Appellants if Fina did not stop criticizing Kane in the press; and (3) Miletto had physically intimidated Appellants before their grand jury testimony, sufficiently stated First Amendment retaliation claims.  *Id.* at 54.  We left it to the District Court to consider in the first instance whether qualified immunity shielded Appellees from liability.  *Id.* at 54-55.

## A.  POST-REMAND MOTION TO DISMISS

On remand, the District Court dismissed Counts One, Four, and Five on qualified immunity grounds.[5]  *Noonan v. Kane*, 305 F. Supp. 3d 587, 605 (E.D. Pa. 2018).  It noted that many of Appellants' claims were grounded in allegedly defamatory speech by Kane against them.  *Id.* at 597.  In its view, the claims that Kane had retaliated against Appellants by defaming them did not violate any clearly established right.  *Id.* at 601,

---

[5]  We discuss qualified immunity in greater depth below.  *See infra*, Sec. III.B.

604. The District Court also concluded that the harms alleged by Appellants were not actionable, as some averred only damage to their reputations, while others who alleged that they had suffered employment consequences did not allege that Kane had, in addition to defaming them, exerted any official pressure against their employers in retaliation for exercise of their First Amendment rights. *Id.* at 601-04.

## B. SUMMARY JUDGMENT MOTIONS

The District Court granted Appellees' motions for summary judgment on the remaining claims. *Noonan v. Kane*, 504 F. Supp. 3d 387, 411 (E.D. Pa. 2020). It concluded that Appellants had no protectable interest in the non-disclosure of pornographic emails exchanged on government email accounts in the course of their public employment. *Id.* at 406. It also determined that summary judgment was appropriate because Appellants had adduced no evidence that Kane had threatened Appellants or their employers with adverse regulatory action sufficient to trigger liability. *Id.* at 406-09. The District Court acknowledged that other employees of the OAG had impliedly threatened Appellants in connection with their public statements against Kane but reasoned that Appellants could not make a showing that Kane had directed OAG employees to make such threats. *Id.* at 407-08.

The District Court further found Appellants' claims as to a conspiracy between Miletto and Kane to retaliate against Appellants lacking because no evidence existed as to any agreement between Appellees to deprive Appellants of their rights. *Id.* at 409. Finally, the District Court dispensed with Appellants' arguments that the release of their

11

emails was a violation of the RTKL or a violation of their First Amendment rights. *Id.* at 410-11.

## III. ANALYSIS

Appellants[6] collectively assert that the District Court erred in its resolution of all six Counts of their complaint. Noonan, Feathers, Sheetz, and Fina urge that Kane's conduct was so egregious that it was not entitled to evaluation under the standard of *Suarez Corp. Industries v. McGraw*, 202 F.3d 676 (4th Cir. 2000), which our Court adopted in *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001). They argue that Kane's release of emails and documents in the OAG's control in violation of the RTKL precludes application of qualified immunity to her. Costanzo argues that the District Court erred in entering summary judgment despite the evidence that Kane's retaliatory actions caused adverse employment consequences for him.[7] For the following reasons, we will affirm the District Court's grant of the motion to dismiss with respect to Counts One, Four, and Five, and the grant of summary judgment on the remaining Counts.

### A. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's treatment of

---

[6] Costanzo filed separate briefs from the remainder of Appellants before us. We will refer to Appellants' arguments separately where appropriate.

[7] Costanzo also raises the District Court's reliance on *Paul v. Davis*, 424 U.S. 693 (1976) as a basis for reversal. While *Paul* concluded that defamatory statements by public officials were not cognizable as Due Process or "right of privacy" claims under § 1983, *id.* at 713-14, Appellants' complaint raised only First Amendment retaliation claims. *Paul* is therefore inapposite and has no bearing on our analysis.

12

the dispositive motions in this case de novo, applying the same standards as the trial court and drawing all inferences in favor of the non-moving party. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009).

In our review of the District Court's grant of the motions to dismiss, "[w]e 'are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant.'" *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number: LW001804*, 822 F.3d 136, 140 (3d Cir. 2016) (quoting *Foglia v. Rental Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)).

In evaluating the District Court's entry of summary judgment, we will view all facts "'in the light most favorable to the non-moving party,' with 'all reasonable inferences [drawn] in that party's favor.'" *Jutrowski*, 904 F.3d at 288 (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). We will affirm the entry of summary judgment when the movant nevertheless establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

## B. MOTION TO DISMISS

In Counts One, Four, and Five, Appellants claim Kane's defamatory statements to the press violated their constitutional rights. The District Court observed that Kane's

13

actions did not violate any clearly established right of the Appellants and concluded qualified immunity was applicable. *Noonan*, 305 F. Supp. 3d at 601-05. We agree.

"Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). "[T]o establish a section 1983 claim, a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

To plead a First Amendment retaliation claim, "a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006). As the District Court observed from our prior opinion, only the second element is in dispute. *Noonan*, 698 F. App'x at 53.

An official's retaliatory action "need not be great in order to be actionable," but must be more than *de minimis*. *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Where a public official's retaliatory actions take the form of speech, and the "public official's own First Amendment speech rights are implicated," no action will lie "in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory

14

action will imminently follow." *Suarez*, 202 F.3d at 687; *see also McLaughlin*, 271 F.3d at 573. Crucially, without the threat of official action, a public official's speech "does not adversely affect a citizen's First Amendment rights, even if defamatory." *Suarez*, 202 F.3d at 687.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A public official's conduct "violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (internal quotation marks omitted).

Kane's statements did not violate clearly established law when they were made, as Appellants did not allege that Kane exercised or threatened official action against them. Because those allegations in the complaint do not satisfy the *Suarez* standard, Kane is entitled to qualified immunity on Counts One, Four, and Five.

### C. SUMMARY JUDGMENT

The District Court entered summary judgment in Appellees' favor on the remaining claims. *Noonan*, 504 F. Supp.3d at 411. Counts Two and Six concern retaliation by Kane with the release of confidential material from the 2009 CUES-Mondesire grand jury investigation, making defamatory statements against the

15

Appellants, and the release or threatened release of pornographic emails exchanged by some of the Appellants on OAG computers.

Kane's defamatory statements, even if expressed in retaliation for Appellants' exercise of their First Amendment rights, may not form the basis of a First Amendment retaliation action that survives summary judgment. *Suarez*, 202 F.3d at 687. Those statements did not threaten adverse regulatory action, punishment, or sanction. Although Suarez discussed an exception for "the retaliatory disclosure of information [that] 'relates to' those personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,'" no one here contends that exchanging pornography via government email accounts is such a personal right. *Id.* at 688 (internal quotation marks omitted).

While Appellants marshalled evidence that other employees of the OAG threatened the release of certain emails in an effort to silence them, they did not present evidence that Kane herself ordered the threats against them. Such claims must fail, as § 1983 claims may not be founded solely on a theory of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-93 (1978). Kane must have directed her subordinates to threaten Appellants for liability to attach to her.

Summary judgment was likewise appropriate on Count Three for lack of evidence that Kane directed, or otherwise conspired with, Miletto to threaten or harass Fina or Costanzo before their testimony to the grand jury. Rather, the record reflects that Kane and Miletto had, at most, one interaction when Kane congratulated Miletto during a visit to the OAG's Norristown office.

Noonan, Feathers, Sheetz, and Fina suggest that Judge Carpenter's reasoning in support of the protective order issued during the grand jury investigation weighs against a grant of summary judgment for Appellees. Neither they nor any authority they cite suggests that Judge Carpenter's protective order should have preclusive effect in this action. Rather, independently evaluating the record at summary judgment before us and before the District Court, there is no basis to conclude that "a reasonable jury could return a verdict" for Appellants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV. CONCLUSION

Accordingly, we will affirm the order of the District Court partially granting Appellees' motions to dismiss and the entry of summary judgment in Appellees' favor on the remaining claims.